Charles E. JOHNSON and E. E. Scannell, Appellants,

v.

Jean E. KIRKLAND, Fidel Leal Farms, La Sara Harvesting Ass'n, Rio Vista Cotton Growers' Ass'n, Valley Farmers, Cooperative Harvesting Ass'n, Lake Farmers' Cooperative Society, Producer, Harvester and Farmer Cooperative Society, Continental Farmers' Cooperative Society, Rio-Val Farmers' Cooperative Society, Sebastian Farmers' Cooperative Society, Willamar Farmers' Cooperative Labor Society, Harlingen Farmers & Producers Gin, and Coyotes Harvesting Ass'n, Appellees.

No. 18478.

United States Court of Appeals Fifth Circuit.

April 12, 1961.

Rehearing Denied June 1, 1961.

William B. Butler, U. S. Atty., Robert C. Maley, Jr., Scott T. Cook, Asst. U. S. Attys., Houston, Tex., for appellants, Earl Street, Regional Atty., U. S. Dept. of Labor, Dallas, Tex., Larry S. Parnass, Atty., U. S. Dept. of Labor, Dallas, Tex., of counsel.

Sander W. Shapiro, Donald S. Thomas, Clark, Mathews, Thomas, Harris & Denius, Austin, Tex., for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges

JOHN R. BROWN, Circuit Judge.

The specific question raised by this case is whether the Secretary of Labor has the power under the Migratory Labor Act, 7 U.S.C.A. §§ 1461–1468, to impose a minimum wage scale or minimum wage fixing schedule for Mexican workers which is determined by standards other than the current prevailing domestic wage rate for like agricultural work. The District Court granted a preliminary injunction against the District Director of the Labor Department for the Rio Grande Valley area and the Manager of the "Bracero" Center, each being residents of the Southern District of Texas. No relief was granted against the Secretary of Labor, the Chief of the Bureau of Employment Security, Department of Labor, both residents of Washington, D. C., or the Regional Director of the Bureau of Employment Security who resides in Dallas.

■ Ordinarily we would not reach the substantive question for on such an appeal the issue is one merely of abuse of discretion pending a final hearing. General Gas Corp. v. National Utilities of Gainesville, Inc., 5 Cir., 1959, 271 F.2d 820, 825; Mansfield Hardwood Lumber Co. v. Johnson, 5 Cir., 1957, 242 F.2d 45, 46–47. But here it is a paradox that we have to consider (but not decide) the merits extensively to determine whether any relief properly could have been granted in the absence of the Secretary of Labor as a party. If he was indispensable in the sense of effective relief, then clearly the preliminary injunction ought not to have been granted, and these proceedings should terminate without the further cost of precious judicial time. There is also a problem of mootness which is more readily disposed of as the merits illuminate the problem generally.

■ This Act had a triple purpose. First, to protect migrant Mexican workers—referred to traditionally as "wetbacks" because of their illegal entry across the Rio Grande—from exploitation by American employers whose normal economic power was enhanced by the illegal status of the workers. Second, to afford a needed supply of agricultural workers during peak harvesting seasons. And third, to accomplish the First and Second without detrimental effect on domestic workers.

The program envisaged a Migrant Labor Agreement between the Governments of Mexico and the United States[1] and

---

1. As there was some possibility that Mexico would not renew the Agreement, § 1461 was amended March 16, 1954, by inserting the italicized words in the parenthetical clause "(pursuant to ar-rangements between the United States and the Republic of Mexico *or after every practicable effort has been made by the United States to negotiate and reach agreement on such agreements)*."

individual employment agreements in the form of the Standard Work Contract prescribed by the inter-governmental Agreement. United States v. Morris, 5 Cir., 1958, 252 F.2d 643.

Under the statute the Secretary of Labor is authorized to establish and operate reception centers, to provide transportation to and from Mexican recruitment centers and such reception centers, to supply some temporary subsistence to workers, to assist such workers and employers in negotiating labor contracts and to guarantee performance by American employers of the provisions of the Standard Work Contract relating to wages and transportation. 7 U.S.C.A. § 1461 (2–6). The American employer is required to agree to indemnify the United States against loss by reason of its guaranty of the individual employment contracts § 1462. The Act does not prescribe wage standards as such, although the Migrant Labor Agreement[2] and the Standard Work Contract[3] do. But it is clear that wages and standard hours of work were not to be such as to deprive willing available American workers of such jobs.

The key to our present controversy—§ 1463—bears directly on this. It provides that no workers shall be available unless the Secretary of Labor has determined and certified that (1) sufficient domestic workers are not available, (2) the employment of Mexicans will not adversely affect the wages and working conditions of domestic workers and (3) reasonable efforts have been made to attract domestic workers.[4]

The specific problem we face relates to piece work. Apparently on the insist-

See 1954 U.S.Code Congr. and Adm. News, at page 2043.

2. The Migrant Labor Agreement, Art. 9, provides that "Mexican workers shall not be employed * * * in any jobs for which domestic workers can be reasonably obtained or where [such] * * * employment * * * would adversely affect the wages and working conditions of domestic agricultural workers * *." This preference must be given both for initial employment and when reducing the labor force.

Article 10 provides that "No employer will be permitted to contract Mexican Nationals unless: (1) he has received an authorization, (2) a certification has been issued with respect to his request for the employment of Mexican workers * * *."

Article 15 provides: "The employers shall pay the Mexican worker not less than the prevailing wage rate paid to domestic workers for similar work at the time the work is performed and in the manner paid within the area of employment, or at the rate specified in the work contract, whichever is higher. The determination of the prevailing wage rate shall be made by the Secretary of Labor. * * * In no case shall the Secretary of Labor make an authorization on the basis of any job order which specifies a wage rate found by the Secretary * * * to be insufficient to cover the Mexican worker's normal living needs. * * *."

3. Article 4 of the Standard Work Contract is substantially the same as Article 15 of the Migrant Labor Agreement, note 2, supra.

4. 7 U.S.C.A. § 1463.

"No workers recruited under this subchapter shall be available for employment in any area unless the Secretary of Labor has determined and certified that (1) sufficient domestic workers who are able, willing, and qualified are not available at the time and place needed to perform the work for which such workers are to be employed, (2) the employment of such workers will not adversely affect the wages and working conditions of domestic agricultural workers similarly employed, and (3) reasonable efforts have been made to attract domestic workers for such employment at wages and standard hours of work comparable to those offered to foreign workers. *In carrying out the provisions of (1) and (2) of this section, provision shall be made for consultation with agricultural employers and workers for the purpose of obtaining facts relevant to the supply of domestic farm workers and the wages paid such workers engaged in similar employment. Information with respect to certifications under (1) and (2) shall be posted in the appropriate local public employment offices and such other public places as the Secretary may require."

The portion starting at * was added by the Act of August 9, 1955, Chapter 679, § 3, 69 Stat. 615.

ence of the Mexican Government, the Secretary of Labor has adopted the fixed policy that the piece work rate must produce a minimum of 50¢ per hour for reasonably diligent workers. The latter qualification led to the crux of this dispute—the celebrated 90/10 formula. In a nutshell this simply means that 90% of the Braceros working for any one employer must each week make at least 50¢ per hour. The only escape was that if more than 10% averaged less than 50¢ per hour, the employer might prove that such workers were incompetent.

During the 1958 season, the Labor Department apparently followed a plan of voluntary compliance, but required a fixed minimum piece rate for specific commodities for those not complying. After numerous protests from American em-

ployers and prolonged conferences with the Department of which Congress had cognizance,[5] this plan was renewed for 1959 but with the minimum piece rate for cotton now being raised to $2.30. Addendums to the Standard Work Contract were required of those not demonstrating compliance and violators were informed that they would not be approved for employment.[6]

That brings us to 1960. On June 28, 1960, the Secretary of Labor through the Regional Director at Dallas established for the Rio Grande area a ceiling of 55,-000 Mexican workers for the period July 1, 1960 through July 31, 1960, based on the information described in the announcement and on the conditions prescribed.[7] While this implied a need for workers which under the statute could

5. See, e. g., hearings on Problems in the Southwest and on Mexican Labor held February-March, June, July 1958 in connection with H.R. 7028, 10357–10361, 10968, at 604, 592–3.

6. Approval is required under Art. 10 Migrant Labor Agreement, see note 2, supra. Art. 7 of the Agreement further provides for listing American employers considered by the Mexican Government to be ineligible because of violations of the Agreement or the Work Contract. This Article also prescribed the machinery for determining disputes as to eligibility of employers. The machinery for investigation and determination of violations by American employers or Mexican workers is prescribed in Art. 30 of the Labor Agreement.

Now pending before another panel of this Court are McBride Farms Marketing Ass'n v. Johnson, 5 Cir., 1961, 290 F.2d 474, and Rio Hondo Harvesting Ass'n v. Johnson, 5 Cir., 1961, 290 F.2d 471. Under the joint Mexican-United States enforcement machinery of Arts. 30 and 7, the appealing employers were declared ineligible for further employment by reason of violations of the record-keeping provisions of the 90/10 policy. The District Court dismissed the suits for want of an indispensable party, the Director of the Bureau of Employment Security at Washington. If in the instant case we were to hold the 90/10 policy invalid, this would cut the ground out from under those adverse administrative determinations. This decision was reached,

though, not because he or the Secretary promulgated the regulations in question but because under the eligibility dispute machinery the final appeal from the Regional Director's decision was his responsibility under 20 C.F.R. 612, subpart D, § 612.56–8; and a formal delegation of authority under General Order 56 (Rev.). On the other hand, those cases involve some questions not now before us. Appellants there argue not only that the 90/10 policy is void, but also that the procedures set up by the Migrant Labor Agreement have not been followed, that the evidence of violations is insufficient and that the Regional Director is the highest person having authority under the Agreement to make final decisions as to an employer's eligibility. This panel does not express any view on these questions or intimate what the decision in these other appeals will, or should, be.

7. This document then stated: "The above ceiling is based on (1) information submitted by the Texas Employment Security Agency, (2) other pertinent data, and (3) representation by the State Agency that a reasonable effort has been made to obtain domestic workers through both intrastate and interstate sources.

"The employment of foreign workers under this ceiling is conditioned on: (1) continued efforts being made to recruit domestic workers for these jobs, (2) domestic workers replacing foreign workers wherever possible, (3) wage offers to domestic workers being not less than those made to foreign workers, and (4)

be filled by Mexicans only if domestic workers were not available, it did not purport to be the unqualified determination and certification required by § 1463(1) (2) and (3), note 4, supra. This announced ceiling has to be read in conjunction with the order of the Director, Bureau of Employment Security, Washington, D. C., of May 17, 1960. After briefly reviewing the unsatisfactory voluntary compliance program of 1958 and 1959, this order promulgated the 90/10 wage policy for 1960 and specified a piece rate of $2.50 per cwt. for picking cotton or such higher rate as necessary to achieve 50¢ per hour.[8]

■ On the argument before us, we became greatly concerned that since the order made specific reference several times to cotton picking "during the 1960 cotton harvest season" this case was moot. The parties thereafter by formal stipulation made explicit what the record otherwise implies that while the specific minimum piece rate of $2.50 per cwt. for cotton is moot, the 90/10 policy applies to all piece work, and these plaintiffs are employers engaged in year around agricultural activities. As to that limited phase, the case is therefore moot. But as to the basic order imposing the 90/10 policy to achieve a minimum 50¢ per hour, the controversy still exists, is real and substantial as is manifested by the District Court's order enjoining the defendants from requiring compliance with "any other ruling of the Labor Department which requires Plaintiffs to contract Mexican workers at wages in excess of the wage paid to domestic workers, or at wages in excess of the prevailing wage, or which requires Plaintiffs to agree to abide by the so-called 90/10 policy."

Attacking this order as one beyond the statutory power of the Secretary, the employers' argument is essentially this. Mexicans may not be imported if there is an adequate supply of domestic workers. Whether there is an adequate supply of domestic workers who are "able, willing, and qualified * * * at the time and place needed to perform the work * * *" necessarily implies that this is tested against the current domestic wage rate or practice. Consequently, the Secretary's authority in the first instance extends to determination (and certification) that there is an insufficient supply of domestic workers. He is not concerned with wages except as it is a part of this determination. This, they say, is proved by § 1461(5) and by the requirement in the Agreement and the Work Contract that Mexican workers and the employers are to bargain on wages with but one specific qualification—that it be not less than the prevailing wage. Once Mexican workers are allowed in the area, the Secretary's authority ceases until domestic workers again become available in adequate supply. If sufficient domestic workers subsequently come into the area, the Secretary must see that preference

---

posting of this ceiling in appropriate local employment offices and other public places."

**8.** The order provided: "Faced with these facts and Secretary of Labor has determined that he is unable to certify under Section 503, Title 5 of the Agricultural Act of 1949, that the employment of Mexican National Workers * * * at a wage rate of less than $2.50 per hundred weight for picking cotton will not adversely affect the wages and working conditions of domestic agricultural workers similarly employed.

"Close examination of records for compliance with the Department's 90/10 wage policy will be continued during the 1960 cotton harvest season since there is no assurance that the policy can be met by all employers paying $2.50 or more per hundred weight for cotton picking."

It was stipulated on the hearing below that this specified $2.50 minimum piece rate and the 90/10 policy was "not based upon the current prevailing wage rate" for this area as the "Secretary * * * has not made a prevailing wage rate determination" nor has the "Secretary * * * based the * * * wage rate * * * upon a determination in accordance with Article 15 of the * * * Agreement [see note 2 above] that a wage rate of less than" the specified rate "is insufficient to cover the Mexican workers" normal living needs.

is given both in new employment and in reduction of labor force [9] and new employment of such domestics must be at "wages and standard hours of work comparable to those offered to foreign workers." § 1463(3). The cumulative thrust of this is that the "adverse effect" element of § 1463(2) refers only to preference in hiring and retention.

To this thesis may be added further arguments. Not the least of these is the likelihood that the reciprocal operation of elements (1), (2) and (3) of § 1463 necessarily relates to the current prevailing domestic wage rate. True, element (2) does not use such terms. But compliance with (3) in the actual efforts to recruit—"attract" domestic workers at the rate payable to Mexicans—and the ascertainment of an inadequate supply under (1) almost have to relate to the prevailing domestic wage rate. This argument gains some support from the 1955 amendments to § 1463, see note 4, supra. The Act as to elements (1) and (2) requires that the Secretary make an actual field survey and then post his findings. Inquiry on wages would have to relate to the currently prevailing domestic wage rate.

This total argument has its crucial climax in the express stipulation (note 8, supra) that in promulgating the 50¢ per hour 90/10 policy the Secretary did not do it on the basis of the current prevailing wage. Indeed, it was further stipulated that no such survey had yet been made for the region and locality in question. If not, then on what basis may the Secretary presume to certify that a lesser wage would "adversely affect the wages and working conditions of domestic" workers?

Offsetting this thesis is the powerful argument of the Secretary that if the employers are right, then element (2) was superfluous since on this theory it was necessarily a part of element (1). Further, the Section must be read as a whole and shows a concern for more than *preference* as to lay-offs and new hirings either initially or after importation of Mexican workers. These arguments, pro and con, are certainly substantial, at least in the sense of meriting a careful analysis. But in view of the disposition we make, we think it inappropriate that we indicate, one way or the other, what conclusion should prevail. We have set them out to illuminate the critical problem of indispensable parties.

■■ This turns, in our judgment, not on the fact that the regulation was issued by the Secretary in Washington or for him by the Director of the Bureau of Employment Security. Nor is it affected by the stipulated fact that the Regional Director in Dallas and the two enjoined local administrators have no authority to determine policy and are required to execute policies fixed by the Department. The first presupposes that validity of the questioned regulation cannot be determined unless the promulgator is there to champion its legality. The second assumes a duty on the part of the governmental subordinate to carry out orders regularly promulgated by superior authority no matter how illegal they may be. The law, as it has developed, rejects both notions. Given a court which has jurisdiction in the sense of a case within statutory jurisdiction,[10] presenting a real, not hypothetical, dispute by virtue of actions taken by local subordinates under such regulations, the superior officer is not ipso facto an indispensable party. Where the regulation is attacked as basically beyond the statutory or con-

9. Art. 16 of the Agreement and Art. 10 of the Work Contract (compliance with which is the direct obligation of the United States) binds the employer to guarantee wages for ¾ths of the contract period in the event of an enforced reduction.

10. This is clearly so here as the plaintiffs' relief depends directly on a law of the United States, 28 U.S.C.A. § 1331 (a) and a law regulating commerce, 28 U.S.C.A. § 1337 (Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L. Ed. 122). As to the latter there is no required minimum amount in controversy.

stitutional power of the Administrator,[11] a court, subject only to the qualification of the capability of granting effective relief, may, and must, adjudicate the issue. State of Colorado v. Toll, 1925, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927; Varney v. Warehime, 6 Cir., 1945, 147 F.2d 238; Yarnell v. Hillsborough Packing Co., 1934, 5 Cir., 70 F.2d 435, 92 A.L.R. 1475; Ryan v. Amazon Petroleum Corp., 5 Cir., 1934, 71 F.2d 1, reversed on other grounds in Panama Refining Co. v. Ryan, 1935, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; Rood v. Goodman, 5 Cir., 1936, 83 F.2d 28. The subject is extensively treated in the Annotation, 158 A.L.R. 1126, see particularly Part III b, c, at 1132-36. The Agency or Executive Department has ample means to advance its contentions in support of the regulation.[12] And, as has been pointed out, the court having power over subordinates in such a situation is not required to assume that an authoritative ruling by a competent court will likely be ignored by the superior who is not a party.[13]

■ In the Federal approach to this problem, the answer turns on practical considerations—practical in the sense of an orderly effective administration of justice. Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 54, 75 S.Ct. 591, 99 L.Ed. 868. The superior is indispensable as a party when, to secure the complainant from unauthorized governmental activity, it is essential that the superior take or not take action. If, on the other hand, the complainants' lawful rights may be vindicated by specific action or non-action of the local subordinates pursuant to court order, the superior's presence is not indispensable. 158 A.L.R. 1126, especially 1128–1132; 2 Barron & Holtzhoff, Federal Practice & Procedure § 515 at 82, 84, Wright Supp. at page 37. All of this has been variously stated in Williams v. Fanning, 1947, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95. "These [earlier] cases evolved the principle that the superior officer is an indispensable party if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him." 332 U.S. at page 493, 68 S.Ct. at page 189. In cases where a public official invades a private right either by exceeding his authority or by carrying out a mandate of his superior "relief against the offending officer could be granted" if doing so is "without risk that the judgment awarded would 'expend itself on the public treasury or domain, or interfere with the public administration.'" 332 U.S. at page 493, 68 S.Ct. at page 189. That the local subordinate "would be left under a command of his superior to do what the court has forbidden" is, the court points out, "immaterial if the decree which is entered will effectively grant the relief desired by expending itself on the subordinate official who is before the court. * * *" 332 U.S. at page 494, 68 S.Ct. at page 189. See also Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 54, 75 S.Ct. 591, 99 L.Ed. 868; Hynes

---

11. This is the case here. No question arises whether, assuming power to promulgate some minimum wage schedule, practice or policy, the instant one is arbitrary or unreasonable. Indeed the briefs state that if the Secretary has authority to fix a wage policy, the 50¢ per hour, $2.50 per cwt. for cotton, or the 90/10 formula is as good as any.

12. The Attorney General has the statutory responsibility for the interests of the United States in any pending suit. 5 U.S.C.A. § 316. Quite properly the subordinate local officials, enjoined below and appellants here, are represented by the United States Attorney joined by the Solicitor of Labor, Department of Labor.

13. See, e. g., Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 75 S.Ct. 591, 99 L. Ed. 868. "It is argued, however, that the Commissioner should be an indispensable party because a judgment against a District Director alone would not be final and binding in other immigration districts. But we need not decide the effect of such a judgment. We cannot assume that a decision on the merits in a court of appeals on a question of this kind, subject to review by this Court would be lightly disregarded by the immigration authorities." 349 U.S. at page 53, 75 S.Ct. at page 595.

v. Grimes Packing Co., 1949, 337 U.S. 86, 96–97, 69 S.Ct. 968, 93 L.Ed. 1231.

This means that the problem must be tested in terms of the result if, under the particular setting, the superior—not a party and hence under no coercive court order—sits tight and does absolutely nothing.

On that test the Secretary of Labor is here indispensable. That is demonstrated by a simple hypothesis. Were we to hold completely for the employers and declare this 90/10 policy illegal, they would gain naught by this litigation. That is because this policy is part and parcel of the affirmative determination and certification which the Secretary must make under § 1463(1, 2) before any workers may become available.[14] Even though we were to hold that the Secretary may not include that as an element, the statute still requires a determination by the Secretary that each of the conditions (1), (2) and (3) of § 1463 have been met. Until he makes that determination, no Mexican worker—whether awaiting transportation from a migratory station in Mexico or assignment to eligible employers at an American Reception Center—may be allowed to work or even negotiate for work.

Measured in terms of action by the local administrators, the result is the same. On this hypothesis, the District Court order prohibited either of these administrators (or their assistants) from applying in any way the 90/10—50¢ per hour policy. But until the Secretary of Labor has certified the Mexican workers to be available, the local agents have nothing to operate on. The Mexican workers, wherever they may be physically, may not be assigned to work. The Court order would be ineffectual. It could grant no real relief.

Of course that is not to say that these employers are necessarily without some legal remedy. If the law, properly construed, does not permit the Secretary to include this 90/10 policy within element

(2) of § 1463, the necessity for his prior determination and certification would not likely give him license to withhold his discretionary duty arbitrarily. Undoubtedly any such conduct is subject to some judicial scrutiny. But by whatever name called—review under the Administrative Procedure Act, 5 U.S.C.A. §§ 1001–1011, mandamus or other extraordinary writ— this would involve the Secretary directly. And for that he should, and must, be a party.

Reversed and remanded.

---

14. It is expressly stated in these terms. See note 8, supra.