**DONA ANA COUNTY FARM AND LIVESTOCK BUREAU et al., Plaintiffs,**

**v.**

**Arthur J. GOLDBERG, Secretary of Labor et al., Defendants.**

**Civ. A. No. 2538-61.**

United States District Court
District of Columbia.

Dec. 21, 1961.

William S. Tyson and Joseph A. McMenamin, Washington, D. C., for plaintiff.

David C. Acheson, U. S. Atty., Charles T. Duncan, Joseph M. Hannon, Harold D. Rhynedance, Jr., Asst. U. S. Attys., Albert D. Misler, Asst. Sol., and Robert L. Callahan, Jr., Atty., U. S. Dept. of Labor, for defendant.

LEONARD P. WALSH, District Judge.

This matter comes before the Court on an original motion of the Plaintiffs for a preliminary injunction. Subsequent thereto, by a stipulation filed by the parties, it was agreed that the evidence and arguments adduced in the course of the hearing on Plaintiffs' motion be deemed to apply to the Defendants' motion to dismiss, or in the alternative for summary judgment. The Court, therefore, has before it the two motions.

Each of the parties submitted proposed findings of fact and conclusions of law at the request of the Court. While the Court has not seen fit to adopt either of these proposals, they have been helpful in stating the facts for the purposes of this memorandum.

Plaintiffs here, the Dona Ana County Farm and Livestock Bureau and the Berino Cotton Growers Association, are (non-profit) New Mexico corporations engaged in contracting Mexican National agricultural workers on behalf of employers who are members of such associations. Other individual plaintiff-employers are also so engaged.

The Agricultural Act of 1949 (hereinafter also referred to as the Agricultural Act), P.L. 78, 7 U.S.C.A. § 1461 et seq., as amended, was enacted to effect the admission into the United States of Mexican Nationals to assist farmers and other employers in the production of certain agricultural commodities, especially cotton, etc. The apparent purpose of the Act was to aid the farmers, and at the same time to protect the interests of American workers from the adverse effect [1] of an influx of foreign labor.[2] The

1. The Agricultural Act of 1949, as amended, in section 503, 7 U.S.C.A. § 1463, reads in part as follows:

"No workers recruited under this Title shall be available for employment in any area unless the Secretary of Labor

United States-Mexican border states were and are, of course, those mainly affected by the Act.

In accordance with the terms of the Act, the United States and Mexico entered into what is known as the Migrant Labor Agreement of 1951, as amended since that time, wherein the terms and conditions governing the admission and employment of Mexican National agricultural workers were set forth in some detail, as will be noted more in detail hereinafter.

Section 501 of the Agricultural Act gives to the Secretary of Labor the authority to establish and operate reception centers, to provide transportation to and from Mexican recruitment centers, to supply temporary subsistence to workers, to assist such workers and employers in negotiating labor contracts, and to guarantee performance by American employers of the provisions of the Standard Work Contract, which binds each of the employers and relates to wages and transportation.

The Standard Work Contract, mentioned above and also negotiated by the two countries, and the Migrant Labor Agreement were incorporated by reference, each in the other.[3] In addition, the Plaintiff-Associations and the individual employers were required by the Agricultural Act, 7 U.S.C.A. § 1462, to execute agreements to indemnify the United States against loss by reason of the latter's guaranty of their contracts. Also, pursuant to Section 32 of the Migrant Labor Agreement, employers agree to be finally bound by the Secretary of Labor's determination as to their indebtedness for wages and transportation, and to designate the Secretary of Labor as their agent to disburse the amounts found to be due the Mexican workers.[4]

Under another provision of the Agricultural Act, 7 U.S.C.A. § 1466, the Secretary of Labor is authorized to enter cooperating agreements with each of the employment security agencies within the States where Mexican National workers are employed. In operation, these agreements normally provide that the State agencies will or may perform certain wage surveys for the Secretary of Labor, subject to reimbursement. While the usual practice was obviously to have the State agency conduct the wage survey, they allegedly did not always do so. In any case, any determination by the State agency was ordinarily considered preliminary in nature only and subject to the final determination by the Secretary of Labor.

Under the prevailing and effective wage rate in effect on, and prior to, June 9, 1961, in the twelve counties of Chaves, Dona Ana, Eddy, Grant, Hidalgo, Lea,

has determined and certified * * * (2) the employment of such workers will not adversely affect the wages and working conditions of domestic agricultural workers similarly employed * * *."

2. Public Law 78 was extended for two additional years, on October 3, 1961, or until December 31, 1963 (P.L. 87-345, 87th Cong., 1st Sess., 75 Stat. 761, 7 U.S.C.A. § 1461 note). The act as most recently amended authorizes the use of Mexican National farm workers in the United States only for seasonal and temporary farming operations and prohibits their use as tractor drivers. The Secretary of Labor is authorized to permit exceptions to these new requirements in specific cases to avoid undue hardship.

While this amendment may make certain aspects of this case moot as of the date of the enactment, since the Plaintiffs complain of damages from and after June 9, 1961, and since other portions of the Act remain intact, there is reason for the Court to treat with, and resolve, to the extent that it can, the issues presented.

3. Bureau of Employment Security publication No. F-146, October, 1959.

4. Article 15, of the Migrant Labor Agreement and Article 4, Standard Work Contract, provide in identical language:

"The employer shall pay the Mexican worker not less than the prevailing wage rate paid to domestic workers for similar work at the time the work is performed and in the manner paid within the area of employment, or at the rate specified in the work contract, whichever is higher. The determination of the prevailing wage rate shall be made by the Secretary of Labor."

Lincoln, Luna, Otero, Quay, Sierra, and Socorro, in New Mexico, the wage rates for certain domestic agricultural workers was much less than that set by the Secretary of Labor to take effect after that date.[5]

This change, therefore, in the prevailing wage rate directed to be effective after June 9, 1961, by the Secretary of Labor was made on the basis of a survey conducted primarily by Federal employees, but with some assistance from the New Mexico State agency.

It was apparently the practice prior to this disputed wage survey that under the cooperating agreement with the State of New Mexico, the State Employment Security Agency of New Mexico would make one pre-harvest wage survey in June of each year, then it would conduct subsequent surveys for vegetables from July through October, and surveys for the cotton harvest from August through December.

The Plaintiffs claim that the wage survey conducted from March 20–April 12, 1961 deviated from the usual procedure employed by the Defendant in the following, among other, respects: (1) time at which conducted; (2) standards and criteria contained in the Employment Security Manual of the Bureau of Employment Security, U. S. Department of Labor, were not followed; (3) selection of large farms, rather than small, for survey of laborers was arbitrary; (4) use of wage data collected for year-round farm workers as setting prevailing wage rates for both year-round and seasonal workers was improper; (5) the sampling process generally was improper in selection of farms, etc.; (6) State officials were improperly excluded from viewing results or commenting on survey; (7) weighting system employed in the sampling was improperly employed; and (9) the provisions of the cooperating agreement between the Federal and State governments were not followed.

The New Mexico State officials disagreed with the evaluation and wage determination and refused to issue the wage rates determined by the Secretary of Labor in his order of June 9, 1961. Plaintiffs claim that one major reason the State agency refused to accept the Defendant's prevailing wage rate determination was that it was adopted through the employment of improper time and methods of sampling. The Plaintiffs also allege that the formula used by the Defendant (known as the 40–51% formula) was an arbitrary method of determining wage rates in that it provides for a 5¢ jump in wage rates, whereas less than 5¢ jumps would be more usual and more "in line" with the prevailing wage rates.

Plaintiffs also claim that the Mexican-National, by receiving certain additions[6] to his cash wage in the form of perqui-

5. Prevailing wage rates for the following types of domestic agricultural workers in the twelve noted counties of New Mexico:

| | On June 9, 1961 | After June 9, 1961 |
|---|---|---|
| General farm hands | 60¢ per hr | 70¢ per hr |
| Irrigators | 60¢ per hr | 70¢ per hr |
| Tractor operators | 70¢ per hr | 75¢ per hr |

6. Plaintiffs' Proposed Findings of Fact state the Plaintiffs and other users and user-members of the employer associations pay the U. S. Department of Labor $12 for each Mexican National agricultural worker contracted. The amount so paid then apparently goes into a revolving fund utilized for the payment of all operations of the Mexican Farm Labor Program, except the expenses of obtaining compliance with such program. Approximately 100% of the cost of the Mexican Farm Labor Program, with the exception of compliance expenses, is

sites, such as free housing, transportation, insurance, etc., is receiving higher *total* wages[7] than his U. S. domestic counterpart.

As both parties appear to agree, the Secretary of Labor is not authorized directly to fix wages under the Agricultural Act, but is only empowered to determine the actual prevailing wages paid to domestic workers in the area of employment which must be paid to Mexican National farm workers performing the same activity in the same area of employment. However, since the determination of the Secretary of Labor was also aimed at ascertaining whether the employment of Mexican Nationals in the user areas here in question was adversely affecting the wages and working conditions of domestic workers, the Secretary's determination may certainly indirectly fix wages. Whether Congress anticipated this possible effect of the Secretary of Labor's certification and determination is open to speculation, but in view of the broad powers given the Secretary by Congress it is not speculative that harsh effects may result from such certifications and determinations made by the Secretary operating within the broad discretion given him.

As noted by the Court in the case of Johnson v. Kirkland, 290 F.2d 440 (5th Cir., 1961), cert. den. 368 U.S. 889, 82 S.Ct. 142, 7 L.Ed.2d 88 (1961), the interaction of elements (1), (2) and (3) of Section 503 of the Act appears to necessarily relate to the current prevailing domestic wage rate,[8] and there are no restrictions on the Secretary's power to

borne by the farm employers utilizing the Mexican National farm workers. In fiscal 1959, $6,025,000 of a total of $6,500,000 was paid by users and only $480,000 for compliance activities was paid by the U. S. Government. H.R.Rep. 2357, Committee on Agriculture, 85th Cong., 2nd Sess., Pt. 2, pp. 108, 122, U.S.Code Cong. & Adm.News, p. 3971.

7. The Migrant Labor Agreement of 1951, as amended, Article 1(c) defines "wages" as:

"* * * all forms of remuneration to a Mexican worker by an employer for seasonal services including, but not limited to, subsistence, incentive payments, employer contributions to or payment of insurance benefits, employer contributions to a pension fund or annuity, and payments in kind."

8. Johnson v. Kirkland, supra, 290 F.2d pp. 444, 445:

"Attacking this order as one beyond the statutory power of the Secretary, the employers' argument is essentially this. Mexicans may not be imported if there is an adequate supply of domestic workers. Whether there is an adequate supply of domestic workers who are 'able, willing, and qualified * * * at the time and place needed to perform the work * * *' necessarily implies that this is tested against the current domestic wage rate or practice. Consequently, the Secretary's authority in the first instance extends to determination (and certification) that there is an insufficient supply of domestic workers. He is not concerned with wages except as it is a part of this determination. This, they say, is proved by § 1461(5) and by the requirement in the Agreement and the Work Contract that Mexican workers and the employers are to bargain on wages with but one specific qualification—that it be not less than the prevailing wage. Once Mexican workers are allowed in the area, the Secretary's authority ceases until domestic workers again become available in adequate supply. If sufficient domestic workers subsequently come into the area, the Secretary must see that preference is given both in new employment and in reduction of labor force * * * and new employment of such domestics must be at 'wages and standard hours of work comparable to those offered to foreign workers.' § 1463(3). The cumulative thrust of this is that the 'adverse effect' element of § 1463(2) refers only to preference in hiring and retention.

"To this thesis may be added further arguments. Not the least of these is the likelihood that the reciprocal operation of elements (1), (2) and (3) of § 1463 necessarily relates to the current prevailing domestic wage rate. True, element (2) does not use such terms. But compliance with (3) in the actual efforts to recruit—'attract' domestic workers at the rate payable to Mexicans—and the ascertainment of an inadequate supply under (1) almost have to relate to the prevailing domestic wage rate. This ar-

determine what the current prevailing domestic wage rate is at any one time contained therein. Therefore, it would appear to the Court that in view of the statutory authority and discretion given, only the most onerous type of arbitrary and capricious action on the part of the Secretary in determining what the current prevailing domestic wage rate is could be held to be beyond his statutory power.

There is an apparent rejection by the Secretary of an interpretation of section 503 similar to that advanced by the employers in the Johnson case with respect to the "adverse effect" element of section 503(2).[9] There is also an indication that the Secretary apparently considers the three elements of Section 503 are so inter-acting that he could within his discretion:

(1) cause a wage survey to be made "designed to determine the prevailing wage rate being paid at that time to domestic workers *employed on a year-round basis*" (emphasis supplied) even though such a rate would apply to seasonal workers also,

(2) ascertain whether the employment of Mexicans in the user areas was adversely affecting the wages and working conditions of the domestic workers similarly employed in the twelve aforementioned counties, since in his opinion "there was an indication that the wages paid for * * * [the three types of workers] in the twelve counties in which Mexican Nationals were employed were *substantially* lower than those paid in *other* counties of New Mexico in which Mexicans were *not* employed * * *" (emphasis supplied).

Now it may well be that the very purposes, alleged to be two-fold, that the Secretary gives for conducting his survey may be subject to criticism. It may be that a determination by the Secretary of a prevailing wage rate for seasonal workers based on domestic workers employed on a "year-round basis" may not have been exactly what Congress intended in Section 503(2). It may have been more technically proper to interpret the Act as meaning that in determining the wage rates of workers "similarly employed" the Secretary should have designed the wage survey so that the prevailing domestic seasonal employees wage rates be established and a different rate be established for Mexican Nationals employed on a year-round basis.

Also, the second of the alleged two-fold purposes for conducting the wage survey would seem to indicate the Secretary is conducting a re-survey in an area that already is employing Mexican Nationals and he is doing it on the basis of what in his opinion is a "substantial" disparity in wage rates between the user counties and non-user counties of New Mexico. However, notwithstanding this, it seems that the main concern of the Secretary was to determine if the employment of Mexican Nationals in the user area was adversely affecting the wages of the domestic workers similarly employed.

As noted earlier, the inter action of the three elements of section 503 ap-

gument gains some support from the 1955 amendments to § 1463, * * *. The Act as to elements (1) and (2) requires that the Secretary make an actual field survey and then post his findings. Inquiry on wages would have to relate to the currently prevailing domestic wage rate. * * *

"Offsetting this thesis is the powerful argument of the Secretary that if the employers are right, then element (2) was superfluous since on this theory it was necessarily a part of element (1). Further, the Section must be read as a whole and shows a concern for more than *preference* as to lay-offs and new hirings either initially or after importation of Mexican workers. These arguments, pro and con, are certainly substantial, at least in the sense of meriting a careful analysis. But in view of the disposition we make, we think it inappropriate that we indicate, one way or the other, what conclusion should prevail. We have set them out to illuminate the critical problem of indispensable parties."

9. See footnote 8, supra.

pear to necessarily relate to the current prevailing domestic wage rate, but the statute is drafted in such broad terms that the Court can come to no other conclusion than that the Section 503, read as a whole, gives the Secretary of Labor broad powers and wide discretion and that the "adverse effect" element of Section 503(2) refers to more than preference as to lay-offs and new hirings, either initially or *after* importation of Mexican workers.

The Court recognizes that the results of the wage survey here may have substantial adverse effects on some employers and that the methods employed in the survey may be subject to attack and the 5¢ step wage increase may be more than would be required, if at all, should a more refined time and method of sampling have been employed. However, Congress gave to the Secretary the power to determine what will or will not "adversely effect" the wages of domestic workers without specifying how he should conduct the survey, what formulas to apply, etc. While the survey could have been conducted at a different time [10] and by employing different methods, the Court, in the light of the statute, cannot say that it was so erroneous, unauthorized, or arbitrary as to be illegal.

While it may appear that more strenuous efforts should be made by the Secretary of Labor to resolve some of the "disagreements" that arise in respect to the utilization of State agencies in conducting surveys, analyzing the results thereof, and making a wage finding, and while that may have been the intended spirit of the Act, 7 U.S.C.A. § 1466, the Secretary is not required to do so by the Act, and the Agreement between the State of New Mexico Employment Security Commission and the Labor Department does not so affirmatively direct.[11]

And so it is with respect to the sampling process and weighting system procedures employed by the Labor Department in the survey. The Labor Department admits certain minor discrepancies,[12] but claims the manner of conducting the survey and the application of the formula was otherwise proper. While it may be urged that the manner of conducting surveys and formulas to be employed could be somewhat standardized with corresponding publication in the Federal Register before and after adoption, the Secretary is not required by law to do so.

It is true that "wages" is defined in the Migrant Labor Agreement as claimed by the Plaintiffs. However, it seems that the term must be interpreted as it appears reading the Agreement and the Standard Work Contract as a whole, and as construed and applied by the United States and Mexican Governments.[13]

On the basis of the law as it exists in this case, taking into consideration the

10. The Government claims it was the "best" time and this is hotly disputed by the Plaintiffs.

11. There is no argument with the fact that a program involving the recruitment of workers from another country should be Federally administered. However, the spirit of the Act, if not its express terms, would seem to recognize that there is a substantial State interest with recruitment and importation of foreign workers within its borders. From a practical point of view, in many cases the State authorities would, it would seem, be closer to the employment situation than the Federal authorities, and they would be interested in protecting their interest. The Congress recognized, it seems, that the Secretary's hands should not be "tied" by the State authorities, but at the same time the latter's cooperation should be sought in making determinations and certifications.

12. At least one carpenter was included in the survey and the Labor Department claims the effect was insignificant and other claims of improper inclusions were claimed to have been corrected.

13. The Bureau of Employment Security Letter No. 499, May 29, 1953, for instance, indicates transportation, housing, *and other guarantees*, are to be considered as additions to the requirement that the employer must pay prevailing wage rates.

dominant purpose of the Act and the broad powers given to the Secretary, United States v. Morris, 252 F.2d 643 (5th Cir., 1958), and the failure to find that the Secretary here acted in an arbitrary, unlawful, erroneous or unauthorized manner, Embassy Dairy v. Camalier, 93 App.D.C. 364, 211 F.2d 41 (1954), the Court is compelled to hold for the Defendants.[14]

The Court is somewhat sympathetic with the position of the employer-users here and their claims. As noted earlier, this program of recruiting Mexican Nationals for agricultural workers must necessarily be Federally administered. However, it seems that Congress intended that it be administered in association and cooperation with State agencies. When the cooperation and communications between the Federal and State agencies break down, no matter who is at fault, the employer stands an excellent chance of being made the one who will suffer. However, if the results here seem somewhat harsh as viewed by the Plaintiffs, as no doubt they do as evidenced by this suit, they are not such as can be relieved by this Court under law.

Therefore, upon consideration of the Plaintiffs' motion for Preliminary Injunction and the Defendants' opposition thereto and motion to dismiss, or in the alternative for summary judgment, and the parties having submitted memoranda of points and authorities in support of and in opposition thereto, and the Court having considered the complaint, affidavits and exhibits, testimony of witnesses and oral argument, and the Court finding that no material issue of fact exists in the case, grants the Defendants' motion for summary judgment and denies the Plaintiffs' motion for a preliminary injunction.

Counsel for Defendants will prepare an appropriate order.

14. On the basis of the Court's finding with respect to the Secretary of Labor's determination, Plaintiffs are *in effect* bound by their employment contract between themselves and the Labor Department, United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951). Also, in the Court's opinion the "Wunderlich" Act, 41 U.S.C.A. §§ 321, 322 is not controlling here with respect to the contract provision on "finality" contained in the Migrant Labor Agreement, Article 32.