296 F.2d 690
 Pedro ESTRADA, Alicia Perez De Estrada, his wife, Alicia
Ybara and Maria Luisa Ybara, his minor children, Appellants,
v.
Edward P. AHRENS, District Director United States
Immigration & Naturalization Service, Miami,
Florida, as Agent for William Rogers,
Attorney General of the United
States, Appellee.
 No. 18633.
 United States Court of Appeals Fifth Circuit.
 Nov. 30, 1961.
 
 David W. Walters, Miami, Fla., for appellants.
 Lavinia L. Redd, Asst. U.S. Atty., Miami, Fla., Douglas P. Lillis, U. S. Immigration Service, Richmond, Va., E. Coleman Madsen, U.S. Atty., Miami, Fla., for appellee.
 Before RIVES, BROWN, and WISDOM, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 Pedro Estrada, his wife, and his wife's two children, relying on the Administrative Procedure Act, 5 U.S.C.A. 1001 et seq., seek judicial review of their exclusion from this country by the Immigration and Naturalization Service. They ask for a mandatory injunction compelling the defendant, Edward P. Ahrens, District Director of the Service at Miami, Florida, to fulfill the requirements of his office, as provided in 8 U.S.C.A. 1225(b) and 1226,[1] by admitting the plaintiffs into the United States for permanent residence or by referring their applications for admission to a special inquiry officer for proceedings consistent with 8 U.S.C.A. 1226. They ask also that the Court issue a temporary restraining order prohibiting 'the defense' from interfering with the plaintiffs' proceeding to the United States for the purpose of appearing before the Court; and that the Court prohibit 'the defendant' from imposing a fine against any carrier bringing the plaintiffs to the United States without their now having visas in their physical possession. The district court dismissed the complaint for lack of jurisdiction. On appeal, the District Director makes two serious contentions: (1) that the plaintiffs lack legal standing because they are nonresident aliens absent from the country; (2) that the complaint fails to join as an indispensable party either the Attorney General or the Commissioner of the Immigration and Naturalization Service. He argues also that the complaint fails to state a claim upon which relief may be granted, an argument we find unnecessary to discuss except in a footnote.[2] We reject these contentions: the plaintiffs are entitled to judicial review of the administrative action by which they are aggrieved. We limit the relief granted, however, because of the absence of the Commissioner from the suit.
 
 
 2
 Pedro Estrada was the Chief of Police of Venezuela during the regime of General Marcos Perez Jimenez, usually described in the American press as a dictator. In January 1958 Jimenez and a number of his supporters fled from Venezuela. Estrada and his family arrived in Miami March 7, 1958, from the Dominican Republic with immigrant non-quota visas valid for four months for entry into the United States. Estrada's arrival raised a question whether his admission to the United States might be prejudicial to the interests of the country, and when the plaintiffs presented their visas the Immigration Inspector at Miami deferred the usual inspection in order to allow the Service time to conduct an investigation. The Estradas were admitted on parole for a period of thirty days. Estrada leased a house in Miami, paid six months rent in advance, entered his children in school, and made arrangements with a doctor for medical care for his wife who was expecting a child in May. Early in April Estrada called on Joseph Savoretti, then District Director at Miami, to ask if any decision had been reached in his case. He informed Savoretti that his wife was pregnant. He said also that he preferred to live permanently in Washington, D.C. After Savoretti cleared with his superiors, Estrada was given an additional parole period of thirty days and told that there was no objection to his going to Washington. Later in April the parole period was extended still another thirty days to June 6, 1958.
 
 
 3
 Saturday, May 18, 1958, allegedly for urgent business reasons, Estrada left for Switzerland intending to spend only a few days and to return to this country as soon as he completed his business. He did not consult the Immigration Service or acquire a permit of re-entry. In a deposition taken April 19, 1960, Estrada says that at no time had anyone informed him that there were any restrictions on his freedom of movement. Savoretti testified that he had an oral understanding that Estrada would keep him informed of his whereabouts. May 21 Savoretti, who was able to identify Estrada's voice, telephoned Estrada in Switzerland, informed him that he should have requested permission before leaving, and told him that he could not return without first securing an immigrant visa. Estrada said that he had left on a Saturday and had not wanted to disturb Savoretti at home, but he had intended letting him know about his trip. The next day General Swing, Commissioner of the Immigration and Naturalization Service, notified all sea and air transportation companies that if any carrier brought Estrada to this country without his having an immigrant visa it would be subject to a fine of a thousand dollars and other penalties under Section 273 of the Immigration and Nationality Act, 8 U.S.C.A. 1323. On the same day, in Miami Beach, Estrada's wife gave birth to a daughter, who became a United States citizen. According to Estrada, from the moment he left the United States his wife was questioned by immigration officers, personally and by telephone, at home and at the hospital on the day of the child's birth until her doctor protested against the questioning. June 10, 1958, against his protests, his wife and children joined him in Spain with the intention of their going back together to the United States. The plaintiffs allege that they made many inquiries and pleas to various United States embassies and to the Secretary of State to have their status clarified. They say that they have never abandoned or waived their applications for admission, and are still seeking to return to Miami and be admitted under their original visas.
 
 
 4
 * A. In granting the defendant's motion to dismiss the action, the district court ruled that the 'court does not have jurisdiction over the case by virtue of plaintiffs' absence from the United States at the time of the filing of the complaint and thereafter'. Earlier, in denying a temporary restraining order, the district court found that 'the record indicates by his action (Estrada) withdrew his application for admission'. If the judgment of dismissal is based on a finding that Estrada withdrew his application, it is clearly erroneous. No evidence in the record supports this finding.
 
 
 5
 B. If the dismissal is based on the mere absence of the plaintiffs, it is erroneous for that reason. Except in cases involving an unwilling litigant, when a court's authority over persons and things within its territory gives it power to impose judgment, the immediate, physical presence or absence of parties to a suit is not a necessary precedent to the court's jurisdiction to decide the suit. The Estradas are not defendants refusing to submit to jurisdiction and against whom a valid personal judgment could not be entered; they are plaintiffs invoking the jurisdiction of the court. The requirement of jurisdiction is satisfied by a nonresident's consent to the court's exercise of jurisdiction. Here, the act of the plaintiffs in bringing suit automatically establishes consent to jurisdiction. Adam v. Saenger, 1938, 303 U.S. 59, 58 S.Ct. 454, 82 L.Ed. 649; Restatement, Conflict of Laws 81, 83; Leflar, Conflict of Laws 29 (1959).
 
 
 6
 C. On appeal, the district director argues that as nonresident aliens absent from the country the Estradas have no legal standing to bring this action. He contends that the plaintiffs' case is predicated solely on the Administrative Procedure Act, and that the Act does not authorize actions by aliens who are not physically present within the United States. We would state the issue in terms of the right to judicial review: Under the Administrative Procedure Act and on the facts this case presents, are nonresident aliens, not now physically present in the United States, entitled to judicial review of administrative action by which they are aggrieved?
 
 
 7
 Section 10 of the Administrative Procedure Act, 5 U.S.C.A. 1009(a), provides: 'Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.' The Act says 'any person'. It does not say 'any citizen'. It does not say 'any person physically present in United States', as the District Director would have it say. The emphasis is on the breadth of coverage; there is judicial review unless a pertinent statute precludes it or the action questioned is a matter of agency discretion.
 
 
 8
 In Johnson v. Eisentrager, 1950, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255, on which the appellee relies, enemy aliens in Germany were denied writs of habeas corpus. Traditionally, until the enactment of the Immigration Act of 1952 and the Administrative Procedure Act of 1946, immigration orders were reviewable only on petition for writ of habeas corpus. In such proceedings the physical presence of the petitioner is meaningful. The essence of habeas corpus is the inquiry as to the physical detention of the individual and the delivery of his body into the hands of the courts. But in a proceeding questioning the validity of administrative action there is no necessary reason to produce the plaintiff in person in court. In Kokoris v. Johnson, 4 Cir., 1952, 195 F.2d 518, 519, five foreign seamen brought a declaratory action under the Administrative Procedure Act for review of agency action and for injunctive relief. The Court had this to say: 'It should be noted in this connection that we are dealing not with habeas corpus proceedings, where presence of the person deprived of liberty is essential to the court's jurisdiction, but with proceedings questioning the validity of administrative orders and asking that they be enjoined or set aside. We think that such proceedings are not rendered moot merely because petitioners are not within the country and that they are entitled to have the orders, which affect their rights and status, vacated or declared void if violative of the provisions of the Administrative Procedure Act.' Taken together, the effect of the Administrative Procedure Act and the Immigration Act is to make available judicial review of agency action relating to immigration by suits for a declaratory judgment and for mandatory and prohibitory injunctions, and to enlarge the scope of review. See Jaffe, The Right to Judicial Review, 71 Harv.L.Rev. 769, 792 (1958).
 
 
 9
 In immigration and deportation cases courts have been especially responsive to the powerful pull of the Act in the direction of the right of judicial review of agency action. Thus, notwithstanding the absence of express statutory authority for judicial review of the deportation statute, the Supreme Court has held that the Administrative Procedure Act allows judicial review of deportation orders. Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868. In Brownell v. Tom We Shung, 1956, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225, the Government attempted to distinguish Pedreiro on the ground that an alien seeking initial admission into the United States is in a different position from that of a resident alien against whom deportation proceedings are instituted. The Court brushed off this distinction. It held that there was nothing in the Immigration Act to bar an alien's challenge of exclusion orders by either habeas corpus proceedings or a declaratory judgment action under the Administrative Procedure Act. The Court pointed our that for a habeas corpus proceeding the alien must be detained, but a declaratory judgment action requires no such basis. "Exemptions from the * * * Administrative Procedure Act are not lightly to be presumed.' * * * and unless made by clear language or supersedure the expanded mode of review granted by that Act cannot be modified.' 352 U.S. 185, 77 S.Ct. 256.
 
 
 10
 A person may be just as 'affected or aggrieved' by agency action if he is a nonresident and absent from the country as he would be if he were a resident and present. It depends on the case. There is no essential difference between the hardship imposed in the instant case where Estrada, holding a valid visa and applying for admission, left the country before initiating suit and the hardship in Kokoris v. Johnson, 4 Cir., 1952, 195 F.2d 518 when five foreign seamen who had either departed or been deported from the country were allowed to challenge the validity of deportation orders. See also Varga v. Ryan, D.Conn., 1957, 160 F.Supp. 113. 'Within (lawful) limitations the scope of review in exclusion and deportation cases is the same * * *.' Gordon and Rosenfield, Immigration Law and Procedure, 8.13, 858.
 
 
 11
 Nonresidence and absence may be important and relevant in many contexts. They have no importance and no relevance here. When an alien, even one perhaps forever destined to be pursued and plagued by his past, has knocked at the door of this country with a visa in his hand, he has a right not to be left dangling in the air and not to be denied admission without the hearing required by law. If Estrada's plight resulted from a government official's misconstruction of the statute, the official exceeded his statutory authority. A court of law is the proper place to test 'unauthorized administrative power'.[3] Under Section 10(a) of the Act Estrada is entitled to a judicial test of the administrative action by which he is 'affected or aggrieved'. He is entitled to a determination of his status, and under Section 10(e) the reviewing court may 'compel agency action unlawfully withheld'.
 
 II
 
 12
 The indispensability of a superior government official as a defendant in a suit against his subordinate is a problem that has long vexed the courts,[4] although, in a major decision in 1948, the Supreme Court seemed surprised that the governing principle 'was not as clear to others as it seems to us.' Williams v. Fanning, 1948, 332 U.S. 490, 493, 68 S.Ct. 188, 189, 92 L.Ed. 95. Fanning however-- we say with deference-- falls short of completely clarifying the principle. Two later cases lend a useful helping hand: Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 and Ceballos v. Shaughnessy, 1957, 352 U.S. 599, 77 S.Ct. 545, 1 L.Ed.2d 583. Our conclusion that the Attorney General and the Commissioner of Immigration are not indispensable parties turns on our understanding of Fanning, Pedreiro, and Ceballos.
 
 
 13
 In Fanning a suit against a local postmaster to enjoin enforcement of a mail fraud order of the Postmaster General was dismissed on the ground that the Postmaster General was an indispensable party. The Supreme Court reversed the dismissal. It recognized that if the plaintiff obtained relief 'the local postmaster would be left under a command of his superior to do what the court has forbidden' but stated, 'that seems to us immaterial if the decree which is entered will effectively grant the relief desired by expending itself on the subordinate official who is before the court.' 332 U.S. at 494. In distinguishing cases when the superior must be joined in the suit, the Court declared that 'the superior officer is an indispensable party if the decree granting the relief sought will require him to take action, either by exercising directly a power lodged in him or by having a subordinate exercise it for him.' 332 U.S. at 493. Fanning leaves unsettled the case when the subordinate is in a position to give the relief the plaintiff seeks but his doing so may require exercise of a power lodged, at least formally, in his superior; thus, the conclusion of a court might depend simply on which side of the coin it looked at. As a result of this uncertainty, courts split on the question whether the Commissioner of Immigration and Naturalization is indispensable in a suit to restrain deportation.[5] See generally Note, Williams v. Fanning revisited, 54 Colum.L.Rev. 1128 (1954).
 
 
 14
 In Pedreiro, the petitioner, in an action for a declaratory judgment and injunctive relief under the Administrative Procedure Act, sought judicial review by a Federal District Court in New York of administrative proceedings resulting in an order of deportation. The court dismissed the suit for failure to join the Attorney General or the Commissioner of Immigration and Naturalization. The Court of Appeals for the Second Circuit reversed, stating:
 
 
 15
 'It sometimes seems that in the very areas of the law where simplicity and flexibility of procedure are most indispensable are found a morass of complexities. This case provides an illustration.
 
 
 16
 'The aliens involved in deportation proceedings are often in poor financial circumstances; the validity of final orders of deportation generally, if not always, depends upon questions relating to the alleged infringement of the deportees' constitutional rights; their imprisonment or enlargement on bail and the actual deportation itself affect human relationships of the highest consequence. Under these circumstances it would seem that the courts must be able to spell out some simple formula, which will cut through red tape, face realities, an provide an expeditious and inexpensive remedy, with a minimum amount of procedural frills and a maximum amount of attention to the question of whether or not the administrative proceedings against the deportee have conformed to the requirements of due process'. Pedreiro v. Shaughnessy, 2 Cir., 1954, 213 F.2d 768, 769.
 
 
 17
 The court found that under the applicable regulations the district director was responsible for the deportation proceedings and that the court could, by an order against him, grant the relief sought by the petitioner. The Supreme Court affirmed the decision. Declaring that 'our former cases have established a policy under which indispensability of parties is determined on practical considerations,' 75 S.Ct. 595, the Court held that since the District Director was authorized to issue warrants of deportation it was 'highly appropriate' that he should 'represent the Government's interest' in the suit and that there was no reason to impose the harsh burden on the plaintiff of requiring him to go to the District of Columbia to obtain judicial review.
 
 
 18
 This decision did not settle the controversy. In Ceballos v. Shaughnessy, 2 Cir., 1956, 229 F.2d 592, the Second Circuit distinguished Pedreior and dismissed the suit for failure to join the Commissioner.[6] The Supreme Court, 77 S.Ct. 548, reversed this decision holding that it was 'not a basis for distinction of Pedreiro that suspension of deportation, rather than deportation itself' was involved. The decision depends on 'the ability and authority of the defendant before the court to effectuate the relief which the alien seeks. * * * Because the District Director is the official who would execute the deportation, he is a sufficient party.'
 
 
 19
 We extract certain fundamental principles from Fanning, Pedreiro, and Ceballos determinative of the isue here.
 
 
 20
 First, 'practical considerations' control. Simplified, workable procedures favoring judicial review should prevail over formalistic, technical concepts of the source of administrative authority. The Supreme Court decision in Pedreiro, like the Court of Appeals decision on which it was based, emphasized the expense and delay to the individual as an important consideration. In ordering the District Court in New York to proceed with the suit the Court said:
 
 
 21
 'Otherwise in order to try his case an alien might be compelled to go to the District of Columbia to obtain jurisdiction over the Commissioner. To impose this burden on an alien about to be deported would be completely inconsistent with the basic policy of the Administrative Procedure Act to facilitate court review of such administrative action. We know of no necessity for such a harsh rule.' 349 U.S. at 53.
 
 
 22
 The liberal review the Administrative Procedure Act envisaged would be frustrated if every alien aggrieved by an immigration order was required to sue in Washington to obtain judicial review. See Adams v. Witmer, 9 Cir., 1958, 271 F.2d 29.
 
 
 23
 Second, Pedreiro recognizes that the real party in interest in such suits is the Government. The practice of bringing suits against an individual official to restrain or review governmental action reflects the historical doctrine of sovereign immunity. In days now long gone by, relief could be obtained only by a showing that the official sued had acted on nvalid authorization or outside his authorization and therefore could not be deemed to have acted for the government. Philadelphia Co. v. Stimson, 1912, 223 U.S. 603, 32 S.Ct. 340, 56 L.Ed. 570. See Larson v. Domestic & Foreign Commerce Corp., 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; Lukens Steel Co. v. Perkins, D.C.Cir., 1939, 107 F.2d 627, 636-637, rev'd, 1940, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108. The doctrine is wearing thin. Recent years have witnessed a great expansion of the individual's rights to seek redress against the government for wrongs committed by it. See Davis,Administrative Law Treatise 25.01-- .03 (1958); Hart & Wechsler, The Federal Courts and The Federal System 1161-63 (1952); Note, 68 Harv.L.Rev. 506 (1955). Probably the two most important federal statutes waiving governmental immunity are the Federal Tort Claims Act of 1946 (28 U.S.C.A. 2674) and the statute involved in this case, the Administrative Procedure Act, also passed in 1946. By providing judicial review in an action brought by 'any person adversely affected or aggrieved by any agency action' Congress permitted suits which under established tests would certainly be barred as suits against the government. Cf., Larson, supra, 337 U.S. at 693-695. The Act thereby makes a clear waiver of sovereign immunity in actions to which it applies. Adams v. Witmer, 9 Cir., 1959, 271 F.2d 29, 34-35. Because the waiver of immunity clears the way for recognition that the government is the real defendant, it is no longer necessary to complicate the problem of indispensable parties by continuing the fiction that the suit is not against the government.[7] See Cunningham v. Macon & B.R. Co., 1883, 109 U.S. 446, 3 S.Ct. 292, 27 L.Ed. 992. The court is now free to focus upon the practical question: does the action provide an adequate opportunity for the government to argue its case without top administrators spending their time dashing around the country defending lawsuits? This consideration is evident in the Supreme Court's statements in Pedreior: 'It seems highly appropriate * * * that the District Director charged with enforcement of a deportation order should represent the government's interest. * * * Undoubtedly the Government's defense can be adequately presented by the District Director who is under the supervision of the Commissioner.' 349 U.S. at 53.
 
 
 24
 Third, in determining whether the suit provides a proper forum for determination of the government's interest, the court should look realistically at governmental organization and delegation of authority. This approach, we believe, underlies the Cofurths ruling in Fanning that the Postmaster General was not indispensable since the local official could grant the necessary relief. The attention to this factor is explicit in Pedreiro where the court examined the agency regulations governing exercise of authority to determine whether it was necessary to join the superior officer in the suit.[8] Ceballos supports this approach. What is significant about Ceballos, in our view, is not that it uses the language of the sometimes Janus-faced test of Fanning but rather that it focuses on the practical aspects of the defendant's 'ability and authority' to give the necessary relief. In Ceballos, to give relief, the Court required the defendant, Shaughnessy, to exercise a power to suspend deportation that was officially placed in the Attorney General but was in practice a power Shaughnessy exercised. Had the Court looked to form and fretted over the problem of authority technically lodged in a superior, it would have found an indispensable party missing. See Gnerich v. Rutter, 1924, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068. Instead, it looked to the 'ability and authority of the defendant before the court to effectuate the relief which the alien seeks' and found it sufficient to allow the suit to proceed despite the absence of the superior. This decision harmonizes with Pedreior when it is noted that nothing the Supreme Court said in Ceballos reduces the indispensability of the superior official when relief will require exercise of a power that in fact, as well as in form, is lodged in him. The crucial test is still the ability and authority of the subordinate to provide relief. See Johnson v. Kirkland, 5 Cir., 1961, 290 F.2d 440.
 
 
 25
 A practical view such as this takes into account the fact that in a country such as ours today governmental activity must be decentralized, if government is to work. The functions of government have grown in size and complexity to the point where it is too great a departure from reality to continue beyond usefulness the fiction that the head of each department exercises personally all the authority lodged in him. Administration of giant programs necessarily involves enormous delegations of authority. Administrative determination of the rights and responsibilities of private persons has to be performed by subordinate local officials. This was always in the cards. It seems only sensible that judicial review of administrative action should occur where the action is taken. That is where the private persons generally will be. That is where the government officials who have handled the case are stationed. It is where the witnesses are. It is where there is a judiciary attuned to local problems.[9]
 
 
 26
 Fourth, the decision in Pedreiro expressly holds that a court should not dismiss a suit for failure to join an indispensable party merely because a decree against the defendants will not bind all other government officials:
 
 
 27
 'It is argued, however, that the Commissioner should be an indispensable party because a judgment against a District Director alone would not not be final and binding in other immigration districts. But we need not decide the effect of such a judgment. We cannot assume that a decision on the merits in a court of appeals on a question of this kind, subject to review by this Court, would be lightly disregarded by the immigration authorities. Nor is it to be assumed that a second effort to have the same issue decided in a habeas corpus proceeding would do any serious harm to the Government. In habeas corpus proceedings district courts would have the duty to consider previous court decisions on the same matter. And even though in extraordinary circumstances new matters not previously adjudicated may arise in habeas corpus proceedings, this is no adequate reason for subjecting an alien to the great burden of having to go with his witnesses to the District of Columbia, which may be far distant from his home, in order to contest his deportation.' 349 U.S. at 53.[10]
 
 
 28
 By not ruling on the res judicata effect of a judgment against a subordinate in a later suit against the superior or another subordinate, the Court left a problem complicating indispensable party questions. Professor Davis argues forcefully that such a judgment should be given res judicata effect. Davis, Administrative Law Treatise 27.06 (1958). It may be that in some situations the prospect of multiple relitigation of a case looms so large as to warrant a requirement that the superior official be joined. But where a court may furnish substantial relief, Pedreiro indicates that it should not be dissuaded from doing so by the absence of a guaranty that its determination will be final and complete. This question, as are most of the others, depends on 'practical considerations.'
 
 
 29
 Fanning, Pedreiro, and Ceballos lead us from the 'morass of technicality.'[11] These decisions establish the overall principle that formalities in the administrative process, especially those based on the theoretical lodgment of authority in the head of an agency, are not to stand as obstructions to parties seeking judicial review of government action by a subordinate official. They reached this result in the face of no little authority in the lower courts imposing more restrictive standards.[12] At the same time, the Supreme Court has put up a large and readable sign that when action by a superior is necessary to the relief sought by the plaintiffs, the superior continues to be an indispensable party. We read this sign and followed its directions in a recent decision, Johnson v. Kirkland, 5 Cir., 1961, 290 F.2d 440, 446.[13]
 
 
 30
 Applying these principles to this action, we conclude that it should not be dismissed for lack of an indispensable party. True, the fact that the Commissioner of Immigration and Naturalization was not joined as a defendant makes it impossible for the court to issue any injunction against him requiring him to retract his notice to the transportation companies or requiring him to take any other action. But no such injunction is necessary in order to afford relief. In substance, Estrada seeks a declaratory adjudication of the question whether he forfeited his rights under his original immigrant visa by leaving the country without permission and without obtaining a permit of re-entry. If the court should find that he did, his recourse is to apply for another immigrant visa. If, on the other hand, the court should determine that he did not forfeit those rights by his departure and that the immigration authorities could not deprive him of those rights by obstructing his return, so that his original visa is still valid, such a decision would provide all the relief Estrada needs. The United States would still be able to determine the desirability of admitting Estrada to this country, as a matter of policy, but once he returned to Florida he would be able to compel the defendant to proceed in an orderly manner with processing his application. The alleged difficulty of obtaining transportation to this country, because of 8 U.S.C.A. 1323, is not a serious obstacle to relief. In express terms, the section applies only 'if a visa (is) required.' A determination by the district court in Florida that Estrada is entitled to pursue his rights under his existing visa would render the statute inapplicable, and make it possible for Estrada to obtain the necessary transportation. The effect of the Commissioner's notice to the sea and air carriers would be nullified by a decree favorable to Estrada.
 
 
 31
 In Florida Estrada landed, in Florida he applied for permanent residence in this country, and in Florida his case was handled by the local authorities. If this suit ends with a judgment for Estrada, Florida officials will process Estrada's application for admission to the country. Except for appeals to the Board of Immigration Appeals, the special inquiry officer's order is final, and the only enforcement officer that need be involved is the District Director. If judicial review of their action should be sought at a later date, the petition would be filed in a United States district court in Florida. The court in Florida is the natural and logical place for this suit to be tried. We order that it be tried there.
 
 
 32
 The case is reversed and remanded for proceedings not inconsistent with this opinion.
 
 
 
 [1]
 The Immigration and Nationality Act, June 27, 1952, c. 477
 Title 2, Ch. 4, 235, 66 Stat. 198, 8 U.S.C.A. 1225(b) provides:
 'Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 273(d), who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be dentained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry.'
 Section 236 of the Act, 8 U.S.C.A. 1226, in part, provides:
 '(a) A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine, and crossexamine the alien or witnesses. He shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 235 shall be allowed to enter or shall be excluded and deported. * * * Proceedings before a special inquiry officer under this section shall be conducted in accordance with this section, the applicable provisions of sections 235 and 237(b), and such regulations as the Attorney General shall prescribe, and shall be the sole and exclusive procedure for determining admissibility of a person to the United States under the provisions of this section.'
 
 
 [2]
 This argument, sketchily briefed by the appellee, is without merit. The District Director argues that Estrada's problem is his inability to obtain passage to the United States because of his lack of a visa, but as we state in Part II of this opinion an adjudication that Estrada's original visa is still operative will remove the obstacles to his passage. The defendants contention that the answer to appellants' dilemma is to secure new visas from an American consul abroad overlooks the fact that possession of a visa creates certain rights that would be lost if the appellants were required to 'start all over again.' An alien in possession of a visa who seeks admission to this country is entitled to a hearing and may be excluded only for valid reasons, subject to judicial review; an alien initially applying for a visa, however, may be summarily turned down by the American consul. Such refusal is usually considered immune to judicial review. See United States ex rel. Ulrich v. Kellogg, 1929, 58 App.D.C. 360, 30 F.2d 984, 71 A.L.R. 1210. The remainder of the District Director's argument is that the extraordinary remedy of an injunction sought by the appellants is not warranted on the facts of this case. these contentions go to the merits of the case, to be decided by the district judge, and do not support the argument that the complaint fails to state a claim on which relief may be granted
 
 
 [3]
 'The responsibility of determining the limits of statutory grants of authority * * * is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction. * * * Under Article III. Congress established courts to adjudicate cases and controversies as to claims of infringement of individual rights whether by unlawful action of private persons or by the exertion of unauthorized administrative power.' Stark v. Wickard, 1944, 321 U.S. 288, 64 S.Ct. 559, 571, 88 L.Ed. 733
 
 
 [4]
 In the indispensable case on the subject, Shields v. Barrow, 1854, 17 How. 129, 130, 139, 15 L.Ed. 158, the Court defined indispensable parties as those who 'not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience.' Professor John Read traces the development of the doctrine from Shields v. Barrow to 1957. Reed, Compulsory Joinder of Parties in Civil Actions, 55 Mich.L.Rev. 327 (1957). He points out that the basic fallacy (present in the appellee's thinking in the instant case) is that because the court does not have jurisdiction over the missing (allegedly indispensable) party, it cannot act with respect to the parties who are before it. Id. at 330-35. Professor G. C. Hazard explores the early history of the doctrine in a recent article, Indispensable Party: The Historical Origin of a Procedural Phantom, 61 Col.L.Rev. 1254 (1951)
 
 
 [5]
 Cases holding the Commissioner not indispensable in such a suit are Yanish v. Wixon, N.D.Cal., 1948, 81 F.Supp. 499; Navarro v. Landon, S.D.Cal., 1952, 106 F.Supp. 73; and Pedreiro v. Shaughnessy, 2 Cir., 1954, 213 F.2d 768, (see discussion of Pedreiro infra). Contra: Rodriguez v. Landon, 9 Cir., 1954, 212 F.2d 508; Paolo v. Garfinkel, 3 Cir., 1952, 200 F.2d 208; Corona v. Landon, S.D.Cal., 1953, 111 F.Supp. 191; Birns v. Commissioner of Immigration and Naturalization, N.D.Ohio, 1954, 103 F.Supp. 180
 
 
 [6]
 The court relled on a distinction it had drawn in Pedreiro between the facts of that case and the facts of a prior case, De Pinho Vaz v. Shaughnessy, 2 Cir., 1953, 208 F.2d 70, in which it held the Commissioner was indispensable. De Pinho Vaz was a suit by an admittedly deportable alien to determine his eligibility for suspension of deportation, whereas in Pedreiro the alien challenged the initial determination that he was deportable. Since suspension is a discretionary matter, De Pinho Vaz presented a stronger need for bringing in the superior officer. In Ceballos, a suit for suspension of deportation, the court found the distinction still valid and followed its decision in De Pinho Vaz that the Commissioner was indispensable. 'While the Supreme Court may decide that the distinction no longer holds, we do not think this is to be spelled out of Mr. Justice Black's opinion in Pedreiro.' 229 F.2d at 593
 
 
 [7]
 Professor Davis writes: 'The realities of the problem do not lie in such conceptual distinctions but lie elsewhere: (1) The central question is one of venue, which in turn has to do with geography. (2) Government attorneys, who are stationed throughout the land, defend the suit whether or not the superior is joined, because the problem of joining the superior arises only when the real defendant is the government. (3) When government attorneys defend the suit because the government is the real party in interest, a judgment or decree against the subordinate must be res judicata against the government and against other government officers, unless the same question is to be litigated a second time between the real parties in interest. (4) When government administration is decentralized, so that action is taken or withheld by local officers, judicial review may appropriately be similarly decentralized.' Davis, Administrative Law Treatise, 27.08 at 596 (1958)
 
 
 [8]
 The Court stated: 'District Directors are authorized by regulation to issue warrants of deportation, to designate the country to which an alien shall be deported, and to determine when his mental or physical condition requires the employment of a person to accompany him. The regulations purport to make these decisions of the District Director final.' 349 U.S. at 52-53
 
 
 [9]
 In Hynes v. Grimes Packing Co., 1949, 337 U.S. 86, 126, 69 S.Ct. 968, 990-991, 93 L.Ed. 1231, 1259, the Supreme Court stated: 'The Court is far removed from the locality and cannot have the understanding of the practical difficulties involved in the conflicts of interest that is possessed by the District Court.'
 
 
 [10]
 This difficulty was also fully discussed by the Court of Appeals and was rejected as a reason for dismissing the suit against the District Director. 'The rationale of the cases holding the Commissioner of Immigration and Naturalization or the Attorney General to be an indispensable party in such cases as this boils down to the assertion that the deportee might move to another district and be taken into custody by the District Director there, and the injunction granted in the pending suit would not bar deportation from such other district. In this sense the remedy would be incomplete and there would be no guaranty against circuity of action and delay. PViewed realistically, however, * * * we think these considerations lack substance. * * * To require the joinder of the Commissioner of Immigration and Naturalization or the Attorney General under these circumstances would, we think, sacrifice substance to mere form and serve no other purpose than perhaps to deny all relief short of habeas corpus to an indigent alien deportee, whose constitutional rights are just as sacred in the eyes of the law as those of a citizen. P If it shall ultimately be found that petitioner is entitled to injunctive relief against the District Director, we believe such relief, even if not as comprehensive as it could be if the Attorney General had been joined, will not only furnish the protection which petitioner solicits and which will afford him adequate protection, but will follow traditional lines, as our courts have always been zealous to prevent public officials from restraining or threatening to restrain the liberty of citizens and aliens alike, in violation of their constitutional rights. * * *' Pedreiro v. Shaughnessy, 1954, 2 Cir., 213 F.2d 768, 770
 
 
 [11]
 Professor Davis, however, argues that the phrase 'ability and authority of the defendant before the court,' as used in Ceballos, 'backtracked into the morass of technicality.' Davis Administrative Law Treatise 27.08, at 587 (1958)
 
 
 [12]
 The decision in Ceballos for instance overruled not only the Court of Appeals decision appealed from but also, it would seem, many others reaching the same result. See Pedreiro v. Shaughnessy, 2 Cir., 1954, 213 F.2d 768, 769, n. 1
 
 
 [13]
 In Johnson v. Kirkland this Court took pains to say that in the federal approach 'the answer turns on practical considerations-- practical in the sense of an orderly effective administration of justice.' Kirkland tested the problem 'in terms of the result if, under the particular setting, the superior-- not a party and hence under no coercive court order-- sits tight and does absolutely nothing.' Using that test, the Secretary of Agriculture was indispensable to a suit by employers of Mexican laborers challenging the wage basis on which the workers are certified, because the Secretary must determine that certain conditions have been met and make the necessary certification. See also Rio Hondo Harvesting Association v. Johnson, 5 Cir., 1961, 290 F.2d 471