The **COUNTY OF SULLIVAN, N. Y.** and the Sullivan County Airport Commission, Petitioners,

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

and

The State of New York and Mohawk Airlines, Inc., Intervenors.

No. 467, Docket 35585.

United States Court of Appeals,
Second Circuit.

Argued Dec. 3, 1970.

Decided Jan. 4, 1971.

Don W. Crockett, Washington, D. C. (Robert M. Beckman, Washington, D. C., Carl P. Goldstein, Atty., County of Sullivan, Monticello, N. Y., and Theodore Drew, Asst. Sullivan County Atty., Monticello, N. Y., of counsel), for petitioners.

J. Michael Roach, Atty., Civil Aeronautics Board, Washington, D. C. (Richard W. McLaren, Asst. Atty. Gen., Gregory B. Hovendon, Atty., Dept. of Justice, Washington, D. C., R. Tenney Johnson, Gen. Counsel, Civil Aeronautics Board, Washington, D. C., O. D. Ozment, Deputy Gen. Counsel, Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, and Robert L. Toomey, Atty., Civil Aeronautics Board, Washington, D. C., of counsel), for respondent.

Philip Weinberg, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., of counsel), for intervenor State of New York.

Raymond J. Rasenberger, Washington, D. C. (Frank J. Costello, Zuckert, Scoutt & Rasenberger, Washington, D. C., of counsel), for intervenor Mohawk Airlines, Inc.

Before FRIENDLY, SMITH and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

This petition to review an order of the Civil Aeronautics Board concerns the rendition of air service by Mohawk Airlines, Inc. to Liberty/Monticello in Sullivan County, New York, an important resort area in the Catskill Mountains.

Mohawk's authority to serve Liberty/Monticello, sometimes hereafter referred to as the Sullivan County Airport, dates back to 1952 when the Board granted certificate authority to Mohawk's corporate predecessor, Robinson Air Corp., Certificate Renewal, 15 C.A. B. 940, 954–955 (1952). Because of the lack of a suitable airport, no service by fixed wing aircraft had been rendered, and a helicopter experiment proved unprofitable. In 1964, with such an airport finally in prospect, the Civil Aeronautics Board renewed this authority for a period terminating October 26, 1967. Mohawk Airlines, Inc., "Use It or Lose It" Investigation, 40 C.A.B. 393, 41 C.A.B. 263 (1964).[1] On April 26, 1967, Mohawk made an application for a further renewal of authority to serve Liberty/Monticello "for three years from the present expiration date" and also to add it as an intermediate point on the carrier's Boston-Cleveland and Boston-Pittsburgh routes. In one paragraph of the application Mohawk served notice that it "intends to rely upon section 9(b) of the Administrative Procedure Act, 5 U.S.C. § 558, and Part 377 of the Board's Special Regulations." The prayer for relief read as follows:

Wherefore, Mohawk prays that the Board amend its existing certificate of public convenience and necessity for Route 94 so as to authorize Mohawk to engage in scheduled air transportation as an air carrier of persons, property, and mail as hereinabove applied for until October 26, 1970. Mohawk also prays for such

---

1. Liberty/Monticello was designated as an intermediate point in segment 1 between New York, N. Y./Newark, N. J., and Buffalo and Niagara Falls, N. Y., and on segment 2 between New York, N. Y./Newark, N. J. and northern New York points. The remainder of these two authorizations was permanent.

other, further, and different relief as the Board may deem appropriate.

The last sentence of § 9(b) of the APA, now 5 U.S.C. § 558(c), provides:

> When the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency.

Mohawk's renewal application thus effected an extension of its Liberty/Monticello authorization beyond October 26, 1967, even though the Board had not acted thereon. The agency approved Mohawk's failure to institute service until a suitable airport was completed. This was ultimately done, at a cost of over $7 million of federal, state and county funds.[2] Mohawk began service on July 2, 1969. In April, 1970, it informed Sullivan County of its intention to allow the service to lapse on October 26, 1970, when it considered that the renewal of its authority achieved by the combined effect of its 1967 application and the last sentence of § 9(b) of the APA would expire.

The notification had the impact that must have been anticipated. On May 4, 1970, Sullivan County and its Airport Commission filed an application with the Board, apparently under § 401(g) of the Federal Aviation Act, to extend Mohawk's authority to serve Liberty/Monticello and moved for an immediate hearing. When the Board got around to this on July 16, more than ten weeks later, it granted the motion and set the application for expedited hearing. Although Examiner Fitzmaurice then proceeded with commendable speed, it became apparent by mid-August that the proceeding would not be concluded by October 26, and the Sullivan interests moved, on August 13, that the Board di-

rect Mohawk to continue service until final determination of the § 401(g) proceeding. On September 23, the Board issued an order observing that, for various reasons there stated, "it would be undesirable for Mohawk to discontinue its services during the pendency of the proceeding," and granted an exemption under § 416(b) permitting the airline to continue to serve Liberty/Monticello until 60 days after final decision in the § 401(g) case. After various conversations, Mohawk informed the Sullivan officials and the Board on October 20 that it did not intend to avail itself of the permission given by the exemption but would discontinue serving the Sullivan County Airport on October 26 when it considered its obligations under the certificate to end.

This led to the motion resulting in the order here under review. The Sullivan authorities promptly made a further application to the Board, arguing that § 9(b) of the APA compelled Mohawk to furnish service until its 1967 renewal application was finally determined, and moving for an order to that end. On October 30 the Board denied the motion on the ground that it was powerless to require Mohawk to render servcie except as a possible outcome of the § 401(g) proceeding. Meanwhile Mohawk had discontinued service on October 26, and Examiner Fitzmaurice had rendered an initial decision in the § 401(g) case adverse to the Sullivan authorities. On November 18, the latter sought discretionary review of the Examiner's decision under the Board's Rule 28, 14 C.F.R. § 302.28. In addition, they had also instituted an action for a declaratory judgment and an injunction in the District Court for the Southern District of New York. It was agreed that proceedings there should be suspended pending review of the Board's October 30 order in this court. The Sullivan authorities filed a petition for such review on No-

---

2. The County asserts the airport was "designed to meet all of Mohawk's requirements." Mohawk says the airport, es-

pecially the large terminal building, went far beyond them.

vember 9, which we heard on December 3.

■ If Mohawk's renewal application had been for a period expiring October 26, 1970, *simpliciter*, the correctness of the Board's decision would be so clear as not to require extended discussion. The final sentence of § 9(b) says that once a timely and sufficient application for renewal or a new license has been made, no "license with reference to an activity of a continuing nature" shall expire until that application has been finally determined. It does not say that an application for a renewal or a new license imposes an obligation beyond the terms sought, which the applicant does not wish to assume. If the words themselves left any doubt what the sentence meant, the context would remove it. The whole thrust of § 9(b) is to protect applicants and licensees, not to impose unsought obligations upon them. The first sentence directs that license applications shall be heard "within a reasonable time." The second sentence protects against suspension or revocation unless written notice of the objectionable conduct is given to the licensee and he is afforded an opportunity to comply with all lawful requirements. The final sentence completes the circle by providing that if the licensee has timely sought renewal, the valuable rights conferred by a license for a limited term shall not be lost simply because the agency has not managed to decide the application before expiration of the existing license. As Mr. Justice Burton said, dissenting in Pan-Atlantic Steamship Corp. v. Atlantic Coast Line R.R., 353 U.S. 436, 444–445, 77 S.Ct. 999, 1005, 1 L.Ed.2d 963 (1957), in a passage with which the majority did not express disagreement:

> The policy behind the third sentence of § 9(b) is that of protecting those persons who already have regularly issued licenses from the serious hard-

ships occasioned both to them and to the public by expiration of a license before the agency finds time to pass upon its renewal.

See also Attorney General's Manual on the Administrative Procedure Act 91–92 (1947).

It may well be, although we do not decide the point, that when the holder of a certificate limited in time applies for a renewal for a fixed period, a literal application of the final sentence of § 9(b) of the APA and the public interest considerations mentioned by Mr. Justice Burton would prevent his withdrawing the application or ceasing service before the stipulated date except on authorization granted pursuant to § 401(g) or (j). But it would be stretching the language of the last sentence of § 9(b) outside its reasonable meaning or intended purpose to give it the effect of prolonging through an indefinite period of administrative inaction the authorization of an unwilling licensee beyond the fixed period for which he has sought renewal.[3]

■ The Sullivan authorities argue that even if that should be so, a different result is required here because of the second sentence in the renewal application, usually dubbed the "catchall" clause, in which Mohawk prayed "for such other, further, and different relief as the Board may deem appropriate." Examination of the Board's files would doubtless reveal such precautionary language in certificate applications going back to the agency's earliest days. The draftsmen of thirty years ago were very likely following equity pleading practice, see, e. g., Form 17 to F.R.Civ.P., without any particularly definite idea what they meant the clause to accomplish. Other practitioners followed their example for safety's sake. Gradually certain uses did emerge. If a person applied for a permanent certificate but, after hearing, was given a temporary one, the "catchall" would surely protect against an ad-

---

3. If it becomes apparent that the agency will not complete proceedings before the stipulated date and the licensee *wishes* the license to continue, presumably he can amend his renewal application or file a new one. See 14 C.F.R. § 377.10(c).

verse party's claim of not having been put on proper notice. See, e. g., Salt Lake City—Rapid City Extension Case, 16 C.A.B. 594, 600 (1952). Whether the catchall clause would oblige the applicant to accept such a certificate or would require an applicant for a short-term certificate to accept one of longer duration are different questions, which do not seem to have arisen. An even more important usefulness was in matters of routing and points of service. The Board might decide to grant certain points sought by an applicant but not others, to arrange them in a different way, to impose restrictions against non-stop or turn-around service, or to authorize service to certain points not sought but nevertheless accepted with varying degrees of enthusiasm. The value of a catchall clause in empowering the Board to authorize routes not specifically requested and in protecting against an adverse party's claim of lack of notice when the Board gave such an authorization was impressively demonstrated by CAB v. State Airlines, Inc., 338 U.S. 572, 575–577, 70 S.Ct. 379, 94 L.Ed. 353 (1950). Again the issue whether a mere catchall clause would *require* an applicant to serve an unrequested stop which the Board included in its certificate seems not to have arisen; the applicant in North Central Airlines, Inc. v. CAB, 281 F.2d 18, 108 U.S.App.D.C. 185 (D.C.Cir. 1960), had gone considerably beyond the stereotyped phraseolgy in indicating willingness to serve additional unspecified cities.[4]

The Board would scarcely have been justified and was much less required to read the catchall clause of Mohawk's 1967 renewal application as expanding timewise the carrier's extremely specific request for renewal of its authorization to serve Liberty/Monticello on segments 1 and 2 "for three years from the present expiration date." The catchall clause could scarcely turn such an explicit declaration of desire to serve for a limited period even without a sifting of the facts into an indication of willingness to serve for whatever period the Board might choose to take to determine the renewal application. Mohawk expected that before the end of the specified term it would have had experience in operating to and from the Sullivan County Airport, which was scheduled for completion by June of 1968, and the proof of the pudding would then be in the eating.[5] Mohawk has now had over a year's experience in serving Liberty/Monticello and considers it a losing proposition. Whatever effect the catchall clause might have had if the Board had acted on the renewal application before October 26, 1970, and had decided to continue the authority beyond that date, or whatever bearing it may have on the Board's power to force Liberty/Monticello upon Mohawk under § 401(g) if the agency should disagree with its Trial Examiner as to the conclusions to be drawn from the evidence developed in the case brought by Sullivan County under that section, issues on which we intimate no opinion, it did not have the effect of continuing Mohawk's obligation to serve Liberty/Monticello after October 26, 1970, without an agency determination of any sort.

We therefore deny the petition to review. We also deny a motion for a mandatory injunction to direct the Board to compel continued service by Mohawk. This seems only to be asking the same thing in another way which would pose additional problems.

4. As Mr. Justice Reed pointed out in the opinion in that case, 281 F.2d at 21, the problem is related to but somewhat different from the issue of the Board's power under § 401(g) [§ 401(h) of the earlier Civil Aeronautics Act of 1938, 52 Stat. 973, 989] to amend an existing certificate to include points the carrier does not wish to serve.

5. Examiner Fitzmaurice's initial decision contains other material indicating Mohawk's scepticism in early 1967 concerning the Sullivan County operation.