BANKERS LIFE & CASUALTY CO.,
Plaintiff-Appellant,

v.

Howard H. CALLAWAY, Secretary of
the Army, et al.,
Defendants-Appellees.

No. 74–3571.

United States Court of Appeals,
Fifth Circuit.

April 21, 1976.
Rehearing and Rehearing En Banc
Denied Aug. 4, 1976.

**626**

Ronald S. Sales, Palm Beach, Fla., William T. Kirby, Chicago, Ill., Martin J. Gaynes, Washington, D. C., for plaintiff-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Patrick A. Mulloy, Dept. of Justice, Wallace H. Johnson, Asst. Atty. Gen., George R. Hyde, Edward J. Shawaker, Attys., Washington, D. C., for defendants-appellees.

Before GOLDBERG and AINSWORTH, Circuit Judges, and NICHOLS,* Associate Judge.

---

\* Of the U. S. Court of Claims, sitting by designation.

1. *Bankers Life & Casualty Co. v. Village of North Palm Beach,* 5 Cir. 1972, 469 F.2d 994,

GOLDBERG, Circuit Judge:

Nineteen years ago, Bankers Life and Casualty Company (Bankers) first acquired a dredge and fill permit from the Army Corps of Engineers, issued pursuant to the Rivers and Harbors Act, 33 U.S.C. § 403. Today Bankers stands before this Court for the second time in five years, struggling to extricate itself from the morass of bureaucratic inaction. Relying on section 9(b) of the Administrative Procedure Act (APA), 5 U.S.C. § 558(c), it asks for a declaration that its permit rights under its 1960 permit have never expired and for an injunction ordering the Corps to hold a hearing on its renewal application. The district court, in an order bare of reasons, dismissed the complaint in response to the Government's invocation of the sovereign immunity and want of ripeness defenses. Although we find that neither of these grounds warranted dismissal, we think the trial court's disposition was correct, for under our reading of section 9(b) of the APA, Bankers cannot prevail on the merits.

## I. FACTS

At the risk of miring the reader in a bog of detail, we have chosen to discuss the facts, which are undisputed for the most part, fairly extensively, in order to place the complex administrative law questions in context. We begin by reproducing the account of the background of this litigation that appeared in our first opinion:[1]

The history of this effort by Bankers to turn part of the waters of Lake Worth into land may be summarized as follows. On April 17, 1957, Bankers paid the Florida State Board of Trustees of the Internal Improvement Trust Fund of Florida (the state agency which at that time could appropriately deal with the matter) the sum of $26,000 for the use of 2,500,000 cubic yards of fill. Much of the fill, approximately 1,116,170 cubic yards, was con-

---

ccrt. denied, 1973, 411 U.S. 916, 93 S.Ct. 1543, 36 L.Ed.2d 307.

sumed in the filling of other lands by Bankers and is not part of the subject matter of this action.

On February 15, 1957, Bankers applied to the Corps of Engineers for a permit to fill the property, and this was granted on or about April 29, 1957. There was nothing in the Federal Statutes at the time that required the Corps of Engineers to consider conservation, and there is nothing in the record to indicate that any study of possible ecological effects was made at that time. The permit which was issued carried the following statement on its face.

"That this instrument does not give any property rights either in real estate or material, or any exclusive privileges."

It also stated that:

"If the structure or work herein authorized is not completed on or before the 31st day of December, 1960, this permit if not previously revoked or specifically extended, shall cease and be null and void."

At the request of Bankers, the Corps, in December, 1960, extended the permit to December 31, 1963. The extension also contained the statement that if work authorized by the permit was not completed during the period of extension the permit would become null and void if not previously revoked or specifically extended. On December 16, 1963, the Trustees wrote the Corps a letter requesting that final consideration of Bankers' application for another permit extension be deferred pending Bankers' receipt of a local fill permit in accordance with Florida Statute Section 253.–124, F.S.A. The Corps agreed to defer Bankers' permit extension and on December 27, 1963, informed Bankers that it would not be possible to grant an immediate extension at that time because of Corps policy when there was local objection.

For several years no further action was taken as between Bankers and the Corps of Engineers. During this time various attempted settlements of disputes were negotiated between Bankers, the State of Florida and the Village of North Palm Beach concerning the title of the submerged lands sought to be filled. On December 6, 1968 and March 17, 1969, Bankers corresponded with the Village in an effort to obtain a local fill permit. In June, 1969, the Village informed Bankers that a permit would be granted; however, shortly thereafter on July 10, 1969, the Village undertook to rescind this action.

By letter dated July 10, 1969, the same date as the meeting of the Village Council rescinding the action of June, Bankers addressed a letter to the Corps of Engineers stating that a permit had been received by letter from the Village of North Palm Beach and stating that "in as much as there were no other objections to the extension of the permit, as stated in your letter of December 27, 1963, to us, I trust this removes the final obstacle and you will grant the extension requested promptly."

The Corps of Engineers, obviously not desiring to resolve any underlying disputes as to whether the requirements referred to in the original request to the Corps from the Trustees had all been met, responded by letter of July 18, stating "it will still be necessary, however, that the written approval of the Trustees of the Internal Improvement Fund be furnished before further action can be taken on your application."

The status of the matter thus was that the state agency had requested that the application be held up in December, 1963. The Corps of Engineers had held it up, indicating that once the matters referred to in the state's letter were cleared it would be the purpose of the Corps of Engineers to proceed with an issuance of the extension. However, it was not until more than five years later that Bankers undertook to inform the Corps that it considered the conditions previously existing to have now been satisfied. The Corps of Engineers, quite appropriately, we think, deferred its action until

it obtained a "go ahead" from the Trustees, the state body which had originally requested the deferment of the issuing of the permit.

*Bankers Life & Casualty Co. v. Village of North Palm Beach,* 5 Cir. 1972, 469 F.2d 994, *cert. denied,* 1973, 411 U.S. 916, 93 S.Ct. 1543, 36 L.Ed.2d 307 (hereinafter referred to as *Bankers I* ).

Thus, to recapitulate, as of December 31, 1963, Bankers was told that it needed two permits in order to conduct its fill operations legally: the Rivers and Harbors Act permit, which it had already held for over six years, had to be renewed, and a local permit from the Village of North Palm Beach had to be secured. Since the Corps refused to grant an extension of the Rivers and Harbors Act permit until the Trustees officially withdrew their objection, and since Bankers took the position that all legal obstacles had been removed, the parties had reached an impasse which led to Bankers' first lawsuit.

## II. *Bankers I*

Bankers' theory in its first effort to assure that it held a valid federal permit proceeded as follows: (1) But for the trustees' intervention, the Corps would have extended the permit in December 1963; (2) the Trustees, as a matter of Florida law, had no power to require a local permit under Florida Statutes § 253.124; and therefore, (3) the original intervention was without effect, and the Corps should be compelled to renew the 1960 permit or issue a new permit.

The district court agreed with this reasoning, and entered two significant orders: it directed the Corps to grant the Rivers and Harbors Act permit without reference to local permits or ecology; and it decreed that Bankers had the right to fill without a section 253.124 permit, and that upon completion of the filling project, title in the land should be quieted in Bankers.

This Court reversed on both points. First, it held that even if the Trustees had been wrong as a matter of state law, it was still error to require the Corps to issue its permit. Primarily, this was because the grant or denial of a permit is not a purely ministerial act. Over the time period since the Trustees first voiced their objection, the Corps had acquired new obligations to consider various environmental factors, all of which applied to Bankers. Rather than filing a formal application with the Corps, Bankers chose to file a lawsuit. Rejecting this approach, the Court held that "[t]he matter was not ripe for court action because the official of the government, who was empowered to act, had not been given an opportunity to perform the duties imposed on him by the federal statutes." 469 F.2d at 999.

With regard to the state law rulings the district court had agreed with the two premises offered by Bankers: that the Trustees' request was the sole impediment to renewal, and that the Trustees had no power to block Bankers' permit. It based the latter holding on its determination that Florida Statute section 253.124, which was added by Laws of Florida, Act of 1957, Ch. 57–362, § 4, did not apply to Bankers by virtue of the grandfather clause contained in section 11 of the Act of 1957.

At this juncture, it becomes important to understand some of the intricacies of Florida law relating to riparian owners' rights in submerged lands. As described in *Bankers I,* at 469 F.2d 997 n. 3, the applicable law prior to the Act of 1957 was the Butler Act of 1921. Under the Butler Act, riparian owners could by the act of filling submerged lands up to a certain line acquire actual title to the new land. The Act of 1957 abolished this procedure and declared that title to the submerged lands was in the Board of Trustees of the Internal Improvement Trust Fund. *See* Florida Statutes § 253.12 (1975). Before the Trustees can convey any interest in the submerged land, the applicant must secure a fill permit. *See id.* § 253.124. It was this permit to which the Trustees referred in their letter of December 16, 1963.

Bankers' assertion that the Trustees were not authorized to require a section 253.124 permit relied on the exemption contained in Laws of Florida, Act of 1957, ch. 57–362, § 11, which provided

that the provisions of Chapter 57–362 would not "affect or apply to the construction of islands or the extension or addition to existing lands . . . which was commenced or application for permit to fill which was filed with the United States corps of engineers prior to [June 11, 1957] . . . ." Bankers' original application for a federal permit had been filed on February 15, 1957, and the permit had been granted on April 29, 1957—both dates well before that mentioned in the statute. Two critical points, however, were in dispute—one factual and one legal. The factual dispute concerned whether Bankers had actually started filling the land prior to June 11, 1957;[2] the legal dispute was whether the exemption ceased to be available when the 1957 permit expired in 1960, as a matter of Florida law. The district court's decree quieting title in Bankers resolved the exemption question in Bankers' favor. This Court found it unnecessary to reach the issue because of the factual dispute. Thus, on remand the district court was directed to dismiss the federal defendants and to conduct further proceedings on the title question—possibly to certify that issue to the Florida courts.

III. *Bankers II*

Taking this Court's advice, Bankers turned to the state courts for adjudication of the question whether it was entitled to the benefits of the grandfather clause in the Act of 1957.[3] On March 8, 1973, Bankers filed its complaint in the instant case.[4] Invoking jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 701 et seq., Bankers made the

following allegations: (1) it was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for the Corps to defer action on the renewal permit until a local permit was secured [5 U.S.C. § 706(2)(A)]; (2) the Corps, in contravention to 5 U.S.C. § 555(b), has not proceeded to conclude the matter presented to it; (3) the Secretary of the Army, the Chief of Engineers, and the District Engineer have unlawfully withheld or unreasonably delayed agency action [5 U.S.C. § 706(1)]; (4) Bankers' rights under the original permit have never expired [5 U.S.C. § 558(c)]; and (5) because a refusal to renew is the equivalent of "withdrawal, suspension, revocation, or annulment," Bankers is entitled to a hearing pursuant to 5 U.S.C. § 558(c). By way of relief, Bankers asked for declarations that there has been unreasonable delay and that the permit rights never expired, and for an order requiring the Corps to hold a hearing on its application for renewal.

Before discussing the district court's dismissal of this complaint, we think it appropriate to stress that this is not the same lawsuit as *Bankers I*, though some of the allegations overlap. Points (1) through (3), all attacking the Corps' delay in processing the renewal application, do seem to be so close to the first stage as to be governed by it. To the extent that these paragraphs ask only that the Corps rule now on the application for renewal one way or another, our discussion of Bankers' present right to a hearing will be dispositive.

Points (4) and (5) raise issues of statutory interpretation that were not con-

---

**2.** In this Court's first opinion, a discrepancy between the parties' stipulation and the district court's findings of fact was noted on this point. This Court therefore found the district court's finding clearly erroneous.

**3.** Bankers instituted a suit for a declaratory judgment in the Florida Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida. On January 8, 1975, that court issued its judgment declaring that Bankers was entitled to fill the bottom lands without first securing a permit from the Trustees in accordance with section 123.124. The Trustees filed their notice of appeal from that decision to the District Court of Appeal of Florida

on February 24, 1975. To date, that court has not rendered a decision, although at oral argument counsel informed us that the case was argued on October 8, 1975, before the appellate court. Whichever way that court decides, however, the unsuccessful party of course has the option of appealing to the Florida Supreme Court.

**4.** The complaint was originally filed with the United States District Court for the District of Columbia. On defendant's motion for a change of venue pursuant to 28 U.S.C. § 1404(a), the case was transferred to the Southern District of Florida.

sidered in *Bankers I.* Both rely on section 9(b) of the APA, 5 U.S.C. § 558(c), which provides as follows in pertinent part:

Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given—

(1) notice by the agency in writing of the facts or conduct which may warrant the action; and

(2) opportunity to demonstrate or achieve compliance with all lawful requirements.

When the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency.

Point (4), which asserts that Bankers' rights under its 1960 permit are still in effect, relies on the last sentence of the quoted portion. Far from being a request to order the Corps to act on the application, point (4) merely raises the question whether this portion of the APA conferred interim rights on Bankers pending the Corps' decision. Point (5), which asserts a right to a hearing, relies on section 558(c)(2). Again, Bankers is not asking the Court to order the Corps to rule one way or another; it is simply maintaining that the APA gives it a right to a hearing at this time since its permit was not renewed. Both of these issues, therefore, are narrow questions of statutory interpretation. They are not disguised reruns of the first case.

The Corps moved to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure on grounds of lack of jurisdiction due to the sovereign immunity bar and failure to state a controversy that is ripe for judicial decision. After a flurry of memoranda had exchanged hands, the court granted the motion, in an order hardly to be faulted for prolixity.[5] We assume that the court's granting of defendants' motion indicated its agreement with one or both of the points raised in the motion to dismiss and structure our discussion accordingly.

### A. Sovereign Immunity

■ We need not pause long over the sovereign immunity defense—indeed, the Corps has not even bothered to pursue this argument on appeal. Since *Estrada v. Ahrens,* 5 Cir. 1961, 296 F.2d 690, the law of this Circuit has been that "the [APA] . . . makes a clear waiver of sovereign immunity in actions to which it applies." 296 F.2d at 698. *See United States v. Joseph G. Moretti, Inc.,* 5 Cir. 1973, 478 F.2d 418, 432. *Cf. Warner v. Cox,* 5 Cir. 1974, 487 F.2d 1301, 1305 (APA does not constitute waiver of sovereign immunity in suit seeking money damages against United States.) Thus, the real question is whether the review provisions of the APA apply to the type of agency action involved here, which brings us to the second ground of the motion to dismiss.

### B. Ripeness

Our discussion of the ripeness *vel non* of the two questions we have indicated were before the trial court must begin with *Abbott Laboratories v. Gardner,* 1967, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681. *Abbott Labs* established a method for analyzing cases in which the timeliness of judicial review poses a problem. First, the court must determine whether Congress in the governing

---

5. The order read:

"THIS CAUSE having come before the Court in motion *to dismiss by defendant Robert F. Foehlke [sic], Secretary of the Army, et al.,* and the Court having considered the record in this cause, and being otherwise duly advised, it is ORDERED AND ADJUDGED that said motion is *granted.*" (Italics denote typed words; remainder appeared on a printed form.) We note that the district court was technically justified in adopting this method of disposition, since Rule 52 provides that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule[s] 12 . . . ."

statute intended to preclude pre-enforcement review of the agency action at issue. In this connection, it is essential to give weight to the general presumption favoring reviewability. *See Dunlop v. Bachowski,* 1975, 421 U.S. 560, 566, 568, 95 S.Ct. 1851, 1857–58, 44 L.Ed.2d 377, 386, 387; *Chicago v. United States,* 1969, 396 U.S. 162, 90 S.Ct. 309, 24 L.Ed.2d 340; *Citizens Comm. for the Hudson Valley v. Volpe,* 2 Cir., 425 F.2d 97, *cert. denied,* 1970, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256; *Textile and Apparel Group v. FTC,* 133 U.S.App.D.C. 353, 410 F.2d 1052, 1054, *cert. denied,* 1969, 396 U.S. 910, 90 S.Ct. 223, 24 L.Ed.2d 185. If the statute does not preclude review, the court must consider whether the controversy is "ripe" for judicial resolution. This determination contains two aspects: the fitness of the issues for judicial decision, and the hardship to the parties of withholding court consideration. Fitness of the issues for judicial decision also depends on two factors: whether the issue is a purely legal one and whether the agency action challenged is "final," taking a flexible view of that term of art. Hardship to the parties contemplates an immediate and direct impact; a certain expectancy of compliance with the agency's action must be present. The dilemma of complying with extremely onerous regulations or risking criminal penalties for noncompliance will often be a strong factor in favor of immediate review. *E. g., Abbott Laboratories v. Gardner, supra,* 387 U.S. at 152–53, 87 S.Ct. at 1517, 18 L.Ed.2d at 693, 694; *Frozen Food Express v. United States,* 1956, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 730.

▮ *1. Status of the 1960 Rivers and Harbors Act permit.* Applying these principles to the question of the present vitality of the 1960 permit, we find that the issue is ripe for decision. Since the dredge and fill permit underlying this controversy was issued pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.,* our first question is whether Congress intended to preclude judicial review under that statute. The Second Circuit, noting that the statute itself was silent both as to availability of judicial review and as to manner of appeal, concluded that review was available under the APA. *Citizens Comm. for the Hudson Valley v. Volpe, supra,* 425 F.2d 97. Finding no reason to disagree with that conclusion, we hold that agency action under that Act is reviewable.

Whether the controversy is ripe for resolution depends, in part, on what "agency action" is at issue. Section 551(13) of the APA defines "agency action" to be "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Section 551(9) defines "licensing" to include "agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license." These definitions are made applicable to the judicial review chapter of the statute through section 701(b)(2), 5 U.S.C. § 701(b)(2). Finally, section 704 provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."

We think it fair to say that the Corps of Engineers has taken the firm position that Bankers' rights under its 1960 permit were not extended by virtue of 5 U.S.C. § 558(c).[6] This position—that the permit rights expired at the end of 1963—can be characterized as "agency process respecting the . . . renewal . . . of a license," since "agency action" can encompass the denial of the requested action as well as the grant thereof.[7]

---

6. For example, in the letter written by the Corps to Bankers on December 27, 1963, the Chief of Operations referred unequivocally to the "lapse in the permit." Similarly, in the present lawsuit the Corps attached to its Memorandum in Support of Defendant's Motion to Dismiss a letter from the District Engineer to Bankers which clearly demonstrated the Corps' belief that Bankers has no permit rights currently. The letter also questioned the present sufficiency of the application for renewal. *See* part III. C.I., *infra.*

7. *Cf. City of Chicago v. United States,* 1969, 396 U.S. 162, 90 S.Ct. 309, 24 L.Ed.2d 340 (no distinction between "negative" and "affirmative" orders); *Environmental Defense Fund,*

Review of this "agency action" presents a question that is purely legal, *i. e.* does section 558(c) prevent the expiration of rights under a Rivers and Harbors Act permit in a situation where local authorities have indicated that a local permit is necessary. Furthermore, the requirement of "final" agency action is satisfied here. The action is "final in the sense that it is an at least firm (and perhaps binding) adoption of a position by the agency with regard to a course of conduct on the part of a member of the regulated industry which does not require further administrative action other than the possible imposition of sanctions." *Northeast Airlines, Inc. v. CAB,* 1 Cir. 1965, 345 F.2d 662, 664. Were Bankers to test the correctness of its position, it would expose itself to possible criminal penalties under section 12 of the Rivers and Harbors Act, 33 U.S.C. § 406. Judicial review at this time would not "disrupt the orderly process of [agency] adjudication," and it cannot be gainsaid that "rights or obligations have been determined" by the Corps' position. *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Trans-Atlantic,* 1970, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203, 210.

The hardship to the parties of withholding consideration would also be great. If Bankers is right, then it would be able to commence filling operations immediately. Because of the criminal sanctions in the Act, it is highly unlikely that Bankers will choose to test its position by action. If Bankers is wrong, then at least it will learn what the true status of its permit is and what steps it must take to secure a valid permit. Viewing all these factors realistically, we find that the hardship factor of the *Abbott Labs* test is satisfied.

Thus, having found hardship, final agency action, a purely legal question,

and no statutory bar to judicial review, we hold that the question whether the 1960 permit rights were extended by force of 5 U.S.C. § 558(c) was and is ripe for judicial resolution.

*2. Entitlement to an administrative hearing on the application for renewal.* Like the permit status issue, this point relates to the Rivers and Harbors Act. It also involves the regulations pertaining to permit applications before the Army Corps of Engineers, 33 CFR § 209.120 (1975). Since nothing precludes judicial review of these regulations generally, we move directly to the question of ripeness.

The Corps' position on this point is that Bankers' application for renewal is incomplete, and therefore that no hearing is required now. However the legal basis for this conclusion is characterized—want of ripeness, or statutory construction of 5 U.S.C. § 558(c)(2)—it is clear that the Corps is refusing to hold a hearing now. Thus, again we find in the Corps' unequivocal position the sort of "agency action" that could be reviewed by a court.

The questions raised by Bankers are again purely legal ones: what does section 558(c)(2) mean, and does it apply to refusals to renew? If this is the kind of situation in which a party is entitled to a hearing before the agency, this Court could order such a hearing to be held.[8] For the same reasons as we found the requisite finality for the status issue, we find here that the agency's firm position on Bankers' lack of a right to a hearing presents final agency action.[9] Finally, the hardship to the parties of withholding consideration would be great. Bankers has no other forum to which it can turn to vindicate its asserted right. We therefore find that this claim is also ripe for judicial resolution.

*Inc. v. Hardin,* 1970, 138 U.S.App.D.C. 381, 428 F.2d 1093 (failure to act is equivalent of denial of request).

8. Ordering a hearing is, of course, quite different from ordering a permit to be issued, since ordering a hearing does not tell the agency personnel how to exercise their discretion.

9. Bankers seems to be arguing that it should have a hearing at which the Corps tells it what to include in the application for renewal. This position assumes that the Corps might change the requirements from those printed at 33 CFR § 209.120 (1975), in response to Bankers' legal arguments. In our opinion, the record clearly shows that this is a futile hope.

Although normally a conclusion that the lower court erred in dismissing a case on ripeness grounds would require us to reverse and remand for further proceedings on the merits, in the unique circumstances of this case we think it best to decide the issues at this time. *See Independent Broker-Dealers' Trade Ass'n v. SEC,* 142 U.S.App.D.C. 384, 442 F.2d 132, 135, *cert. denied,* 1971, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57; *Textile and Apparel Group v. FTC, supra,* 410 F.2d at 1053. With the important facts undisputed, and the issue purely one of statutory interpretation, little could be gained by further development of the record in the district court. Conversely, resolution of the federal issues might be of some aid in the adjudication of the state title questions.[10] Thus, we reject the parties' invitation to abstain from deciding the merits of the controversy and turn to the questions presented.

### C. The Merits

*1. Status of the 1960 Rivers and Harbors Act permit.* Bankers relies heavily on the language of section 558(c) providing that when the licensee has made a timely and sufficient application for renewal, a license with reference to an activity of a continuing nature does not expire until the agency has finally ruled on the application. Bankers also points to a letter which it received from the District Engineer, in which the Corps said "[t]he lapse in the permit will have no effect insofar as the Corps of Engineers is concerned," and to the fact that under the Corps regulations then in effect the District Engineer had no authority to refuse or disapprove an application. *See* 33 CFR § 209.120(c) (1968). On the other hand, the permit itself clearly stated that "this permit if not previously revoked or *specifically* extended, shall cease and be null and void." (Emphasis added). In addition to relying on this language, the Corps also argues that section 558(c) does not apply unless the application is sufficient. At the time the renewal application was filed, it was insufficient because it lacked the required local consents. As time passed, it became more incomplete with the addition of new laws requiring the Corps to take ecological considerations into account for dredge and fill permits.[11]

It might be possible to dispose of this point by relying solely on the language of the permit. Clearly, the permit was never specifically extended; thus, by its own terms, it became null and void upon the date of expiration. However, we need not stand or fall on this ground, for we believe that section 558(c) was not designed to cover this kind of situation.

█ First, we note that the Corps could properly take local opposition to a

---

**10.** The pendency of the state litigation on the land title question (see note 3, *supra*) does not render these claims unripe. The claim about the non-expiration of federal permit rights is a pure question of federal law. It is our view that the status of the permit had to be determined as of the time the Trustees entered their objection to renewal. We note that this objection was based on an honest view of the applicable Florida law, which this Court has already held the Trustees could reasonably have adopted. *Bankers I,* 469 F.2d at 1001. Whether or not the Trustees' position is ultimately upheld thus will not affect the resolution of the question before us. *See* note 12, *infra,* and accompanying text.

Likewise, Bankers' right to a hearing does not depend on the outcome of the state litigation. As we understand the argument, Bankers asserts that it is entitled to a hearing before the Corps at which it can demonstrate that it has complied with all *lawful* requirements for an application and can attack those requirements that it considers unlawful. Its argument about the Trustees' power to block the federal permit is only one of a number of challenges to the application regulations. Thus, if Bankers wins in the state courts, it would still want to present to the Corps questions such as which sections of the Federal Water Pollution Control Act apply to it (33 U.S.C. § 1251 *et seq.*). If the Trustees win in the state courts, Bankers would simply add its challenge to the list of questions for the Corps to adjudicate.

**11.** Our first opinion in this case held that the more stringent requirements of the present apply to Bankers. *See* 469 F.2d at 998. The strong national commitment to improvement of the environment also argues strongly for application of new laws such as the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.,* wherever possible.

fill project into account. We need not decide whether local objections could always operate as a veto over Corps projects, no matter how insubstantial or frivolous, because that case is not before us.[12] Rather, we have the body in Florida with ultimate responsibility over the use of public lands, the Trustees of the Internal Improvement Trust Fund, informing the Corps that the law of Florida requires a local permit for fill work. In almost all the recent environmental legislation, Congress has indicated its desire for federal agencies to cooperate closely with state authorities. *See, e. g.,* Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251(b), (e); National Environmental Policy Act, 42 U.S.C. §§ 4331(a), 4332(2)(C); Clean Air Act Amendments of 1970, 42 U.S.C. § 1857a(a). Under all the circumstances, we believe that the Corps' policy of deference to local objections was justified in the case now before us. Thus, Bankers' application for permit renewal contained one deficiency at the time the Corps had to decide whether to extend the permit.

Judge Friendly described the purpose and effect of the section of the APA at issue in the following manner:

The final sentence [of § 558(c)] provide[s] that if the licensee has timely sought renewal, the valuable rights conferred by a license for a limited term shall not be lost simply because the agency has not managed to decide the application before expiration of the existing license. As Mr. Justice Burton said, dissenting in *Pan-Atlantic Steamship Corp. v. Atlantic Coast Line R.R.,* 353 U.S. 436, 444–445, 77 S.Ct. 999, 1005, 1 L.Ed.2d 963 [, 969] (1957), in a passage with which the majority did not express disagreement:

The policy behind the third sentence of § 9(b) is that of protecting those persons who already have regularly issued licenses from the serious hardships occasioned both to them and to the public by expiration of a license before the agency finds time to pass upon its renewal.

See also Attorney General's Manual on the Administrative Procedure Act 91–92 (1947).

*County of Sullivan v. Civil Aeronautics Board,* 2 Cir. 1971, 436 F.2d 1096, 1099. This reasoning suggests that the kind of case that the statute was meant to cover was that in which time exigencies within the agency prevent it from passing on a renewal application, where an activity of a continuing nature such as radio broadcasting or shipping services is involved.

■ By contrast, in the case before us time exigencies played no part in the Corps' refusal to renew. Instead, a substantive problem arose with the application, which had to be resolved before the Corps could grant a new permit.[13] The Corps' conscious decision not to renew activated the expiration provisions of the permit. Thus, after the period specified in the 1960 permit expired, all rights under the permit expired with it.

■ *2. Entitlement to an administrative hearing on the application for renewal.*—Bankers' second assertion is that section 558(c)(2) of the APA entitles it to a hearing before the Corps at which it is given an opportunity to demonstrate or achieve compliance with the requirements for a dredge and fill permit application. The statute provides that "the withdrawal, suspension, revocation, or annulment" of a license is lawful only after notice and a hearing. It appears to contemplate use of the notice and hearing procedure only when some sanction is to be imposed on the licensee.

---

12. In order to avoid the defect of unlawful delegation to the state authorities, it might be necessary to require the Corps independently to evaluate the merits of the local objection. However, since the objection of the Trustees here was clearly a substantial one, we need not decide the extent of any such duty in this case.

13. A possible alternative ground for our holding is that filling land is not an activity of a continuing nature, but is instead a project that will end as soon as all the land is filled in. Radio broadcasting, in contrast, could conceivably go on indefinitely. Since section 558(c) applies only to activities of a continuing nature, it would not extend Bankers' rights under the fill permit.

*Cf. Blackwell College of Business v. Attorney General,* 1971, 147 U.S.App.D.C. 85, 454 F.2d 928, 933–34; *H. P. Lambert Co. v. Secretary of Treasury,* 1 Cir. 1965, 354 F.2d 819, 821 n.2. The alternative construction of the statute, urged by Bankers, would provide that the "withdrawal" of a permit or license includes a failure to renew an existing license.

For several reasons, we believe that the former reading of the statute is truer to its language and more desirable as a policy matter. A paraphrase of the provision taken as a whole might read "before an agency can institute proceedings to withdraw, revoke, etc., an existing license, it must provide the licensee with notice in writing of the offending conduct and a hearing at which the licensee can refute the charges." Read this way, it is clear that Bankers is not entitled to a hearing under this section of the Act. As a policy matter, this is a desirable result. Assuming that an applicant wanted to challenge some of the requirements for an application contained in the agency's regulations, the question arises, at what point would the application be complete enough to deserve a hearing? If the party wanted to try to enjoin the agency from enforcing a specific regulation that it asserted was beyond the agency's power to promulgate, then it would be free to bring a suit for pre-enforcement review or injunction in the district court.

Challenges to application requirements raise a unique problem in administrative law, since the agency could refuse to consider the challenge until the regulations were complied with and the case moot. However, this dilemma does not convert section 558(c) into a statute giving the right to a hearing on application regulations. Despite Bankers' lamentations that it does not know what the Corps wants, we think that the application requirements set out in 33 CFR § 209.120(h) (1975) are reasonably clear. Similarly, the state authorities would probably be happy to tell Bankers what local permits are required. As long as the possibility of a pre-enforcement challenge to specific objectionable portions of the regulations exists, we cannot say that Bankers will forever be denied its day in court.[14] As the case now stands, Bankers has a choice between transiting its way through the terrain of the Corps' application regulations or attempting to challenge them.

## IV. Conclusion

This is a case of much suspension, and little animation. Without throwing any mud on any litigant's face, we note that this case has had more backing than filling. Many of Bankers' problems are swamped by history, but Job-like sufferings and patience cannot change the law as we find it in the Administrative Procedure Act, the federal environmental legislation, and the Florida laws pertaining to submerged lands. We cannot carve exceptions from the APA for Bankers because the history of its litigation is tortuous and tortured.

In the interest of efficient judicial administration (if, indeed, one can speak of efficiency with a straight face with reference to a case now nineteen years old), we have deemed it best to rule on the merits of Bankers' claims under the Administrative Procedure Act. If Bankers' earnest protestations at oral argument that it desired only to be enlightened as to what it must do in order to have the right to fill its land are given credence, then our disposition should satisfy all concerned. Though the district court was mistaken in its conclusion that the

14. We certainly cannot say that all of Bankers' points are frivolous in this regard. For example, the Corps requires certifications under section 401 of the Federal Water Pollution Control Act, 33 U.S.C. § 1341, for a dredge or fill permit. 33 CFR § 209.120(h)(2)(ii) (1975). Bankers contends that this regulation goes beyond the statutory authorization, since section 404 of the Act deals with dredge and fill permits, and it contains no certification requirements. *See* 33 U.S.C. § 1344. This raises a serious question about the scope of the regulation which might well be justiciable in a proper court proceeding. We see no need, though, to require the Corps to pass on this matter again, under some sort of primary jurisdiction theory. The choice is up to Bankers to comply with the regulations or to try to challenge them.

**636**

case was unripe, our consideration of the fully matured issues has led us to reject Bankers' claims. Since our affirmance of the district court's order is based on our opinion of the merits we note that the dismissal should be one with prejudice. Now that the administrative path has been cleared of underbrush, both parties should proceed to discharge their respective responsibilities for achieving a solution without sloth and delay. Let not any further glacial inertia mark this case as a relic of the Pleistocene epoch.

AFFIRMED.